Laurance J. OCHS, Appellant,

v.

L'ENFANT TRUST and West End Condominium Association, Appellees.

No. 84–1540.

District of Columbia Court of Appeals.

Argued Oct. 9, 1985.

Decided Jan. 31, 1986.

Laurance J. Ochs, Washington, D.C., pro se.

Benny L. Kass, Washington, D.C., for appellees. Laurie Farnham Hurvitz, Washington, D.C., also entered an appearance.

Before PRYOR, Chief Judge, NEWMAN, Associate Judge, and PAIR, Senior Judge.

PAIR, Senior Judge:

Appellant Laurance J. Ochs is an owner in fee simple of a unit in the West End Condominium on 21st Street, Northwest, and a member of its owner association, appellee West End Condominium Association (hereinafter the "Association"). Brought into question in this appeal are separate orders of the Superior Court which together validated the Association's grant of a conservation easement to appellee L'Enfant Trust (hereinafter the "Trust"), upheld the Association's special assessment to appellant for use in financing the easement, and awarded the Association attorney fees in connection with the litigation in the amount of $10,000.

As grounds for reversal, appellant principally maintains that (1) the grant of the conservation easement was not in accordance with law and the condominium documents; (2) the Association's allocation of the easement assessment to less than all of its members was improper; and (3) the trial court erroneously included in its award of attorney fees the costs and legal expenses incurred by the Association in defending his suit to have the easement grant declared void. We agree only with appellant's last contention and, accordingly, remand this case to the trial court for further proceedings on this issue.

I

The Association is comprised of the owners of 34 units in the West End Condominium, a "horizontal property regime" recognized as such under the District of Columbia Condominium Act of 1976, D.C. Code § 45–1801 *et seq.* (1981). In late 1981, the Association was approached by the Trust, a non-profit foundation, regarding the possibility of the Association donating to it a "conservation easement" in the facade of the condominium building. The proposed easement was designed primarily to help

preserve the historic nature of the neighborhood, which is known to some as the DuPont Circle Historic District. The easement would constitute an encumbrance on the property and would grant to the Trust the right to review and approve any Association decision affecting the exterior of the building, whether structural or cosmetic in nature. The condominium owners would be directly affected by the conveyance of the easement, particularly insofar as it encumbered their individual, undivided percentage interests in the building's facade, which is designated a "common element" in the condominium instruments.

The events which precipitated the granting of the conservation easement to the Trust were as follows. In May 1982, the President of the Association's Board of Directors, Mr. Gordon .Binder, circulated a memorandum to all condominium owners notifying them of the Association's upcoming "special" mid-year meeting. The memorandum placed on the meeting's agenda a discussion of the proposed conservation easement and explained its purpose and ramifications. It was noted that the easement "would convey an ownership interest" in the property to the Trust and would be financed by the Association through a special assessment on unit owners. The owners were told, however, that they "should realize ... a charitable deduction on their income taxes" as a result of the conveyance. The owners were informed further that the grant would require an amendment to the condominium declaration and by-laws, which itself would require approval by two-thirds of the Association members. For this reason, a proposed by-laws amendment was attached to the memorandum.

The special mid-year meeting was held in June 1982 and, according to its recorded minutes, the proposed conservation easement was discussed at length. A representative of the Trust attended the meeting and explained that "[b]ecause the easement donation [would be] granted in perpetuity, it constitutes an encumbrance and ... it

qualifies as a charitable donation worth by some estimates 10% of the market value of the property." It was clarified that the Association would have to comply with the condominium instruments in granting the easement, including the requirement that two-thirds of the owners assent to the conveyance. Ultimately, on motion, a vote was taken to grant the easement and to amend the by-laws to implement the donation. Although the motion was defeated, a related motion to authorize the Association's Board of Directors to pursue the subject more thoroughly was unanimously approved. Thereafter, the Board filed a preliminary application with the Trust to ascertain whether it would accept the conservation easement, commissioned an appraiser, and obtained a letter ruling from the Internal Revenue Service that the Trust qualified as a tax exempt organization.

On September 20, 1982, the Association's Board of Directors met and discussed, among other things, the proposed easement. At the meeting, Binder presented to the Board a progress report which included a tentative timetable for approval and conveyance of the easement to the Trust. Mr. Dale Kenney, the Secretary of the Association, reported that the appraiser had valued the condominium building at nearly 3.5 million dollars and had valued the easement donation at slightly over $265,000, or approximately 8% of the building's appraised value. But no further action regarding the easement was taken at the Board's September meeting.

A few days later, Binder received the formal appraisal on the values of the property and the proposed conservation easement. It was estimated that the property had a pre-easement value of $3,315,810, which would be reduced to $3,050,545 in the event the easement was conveyed. In detailed findings, the appraiser represented that the "easement directly preserves the facade of the subject property, thus insuring the architectural integrity inherent to the building, and complementing and pre-

serving the historic significance of the neighborhood environment." The appraiser enumerated, however, those factors contributing to the adverse impact the easement could have on the building's value, including the following: slightly greater insurance premiums; additional legal expenses over the years; possible lender resistance in a future sale or refinancing resulting possibly in more expensive financing; increased costs of eventual repairs to the facade; loss of the potential for future "higher and better use of the land"; restrictions on exterior alteration or modification; inconvenience of facade inspections; possible delays in obtaining approval for desired repairs; and the possibility of a lien being placed on the property for restoration of the facade.

On October 1, 1982, the Association's Board of Directors circulated a detailed memorandum to all unit owners on the proposed conservation easement, the purpose of which was to poll the Association for a final vote on whether it should donate the easement to the Trust. The owners were asked "to vote, as a package, on amending the Declaration and the By-laws and on levying a special assessment of $17,263 to pay the required contribution to the Trust and the other costs of this transaction. All three must be approved to effect the donation." Attached to the memorandum were copies of the letter from the Internal Revenue Service respecting the Trust's qualification as a tax-exempt organization, the appraiser's report, a "letter and accompanying materials" which the owners were to submit to their mortgagees, proposed amendments to the Condominium Declaration and By-laws authorizing a special assessment of $17,263, a "schedule of Estimated Special Assessments" to be used by each owner in estimating his or her individual assessment, a ballot to be used by the owners in casting their votes (which was to be returned no later than October 25, 1982), and a draft "Conservation Easement Deed of Gift."

By its memorandum, the Board informed the unit owners that if the Association voted to grant the easement, the special assessment would be due no later than December 7, 1982. The owners were advised further that "[t]he Board makes no representations how the [Internal Revenue Service] would rule [on the charitable deduction] if it reviewed the situation of individual taxpayers"; and "that because the owner of units 102 and 106 is not subject to U.S. tax laws, the Board, upon advice of counsel, recommends assessing 'around' him. His increment is apportioned among the other 32 units in proportion to each unit's share of the building." The easement package was mailed to non-resident unit owners and was slid under the doors of the unit owners who lived in the building.

At a meeting of the Board of Directors on October 25, 1982, it was reported that an insufficient number of ballots had been received to adopt the special assessment and the amendments to the condominium instruments by a two-thirds vote. The minutes of that meeting indicate that the Board decided it would contact those unit members who had yet to submit a ballot. The minutes further reveal that the Board, upon receipt of a letter from the Department of the Interior respecting the eligibility of the building for historic treatment, "would submit a formal application to the L'Enfant Trust and send the letter regarding the assessment to the owners."

On November 3, 1982, Kenny, in his capacity as the Association's secretary, informed Binder by memorandum that as of November 2, he had received more than two-thirds affirmative votes from the unit owners for donating the facade easement to the Trust. By a memorandum dated November 5, Binder relayed this information to all unit owners. Binder advised them that the Board would proceed with the donation and that "[t]he same vote authorizing the easement levied a special assessment on Association members per the attached schedule," the payment of

which was due no later than December 7. The unit owners were also informed that if payment was not forthcoming by December 7, a late fee of $50 would be charged for the first week in arrears, and a fee of $75 for each succeeding week until payment was received by the Association.

On November 10, 1982, appellant informed Binder by letter that he objected to the granting of the easement, and the related assessment, on the ground that it was "illegal and without a rational basis to support a deduction for federal income tax purposes." This conclusion was based on several factors, to wit: the appraisal was "internally inconsistent"; "Article 17 of the Condominium Declaration expressly prohibits the abandonment of the common elements unless the condomimium regime is terminated"; since each unit owner has an individual interest in the common elements, each unit owner must assent to the proposed easement conveyance; and finally, the Condominium By-laws had been violated by the Board's mail-ballot procedure. And, on these grounds, appellant declared to Binder that he would "never" agree to the proposed easement and threatened a lawsuit if the easement was conveyed to the Trust.

During succeeding weeks, appellant and the Board exchanged correspondence concerning the proposed easement which culminated in a Board meeting on December 8, which was attended by appellant and other interested unit owners. After extensive discussion among those present, the Board of Directors on motion voted to proceed with the easement donation. On December 16, 1982, the "Unit Owners of the West End Condominium" granted a "Conservation Easement Deed of Gift" to the Trust thereby restricting the Association's control over the building's facade.

## II

On January 13, 1983, appellant filed in the Superior Court a "Complaint to Quiet Title and Damages for Trespass" on the basis of the Association's conveyance of the conservation easement to the Trust. Appellant prayed for, *inter alia,* a declaration that the Trust had "no estate, right, title, lien or interest in or to said real property or any part thereof," an order enjoining the Trust and the Association from interfering with his possession, use and enjoyment of the property, compensatory damages of $10,000, and punitive damages in the sum of $30,000. The Trust and the Association filed a timely answer in which they denied appellant's allegations, and which they amended to include a counterclaim against appellant for the special assessment that had been levied against him ($707.27), late fees ($725 through February 16 and $75 per week thereafter in which the assessment remained unpaid), interest on the judgment, costs, and reasonable attorney fees. Shortly thereafter, appellant filed an answer to the counterclaim alleging that the counterclaim was predicated "on illegal acts undertaken by [the Association] contrary to the West End Condominium's Declaration and By-laws." More specifically, the answer alleged that the Association was without authority to levy the special assessment and, in any event, did not do so according to his percentage interest in the condominium, for he was being required to pay partially for a non-assessed unit owner's contribution.

On March 11, appellant moved for partial summary judgment on his claim that the conservation easement should be declared void. The Association and the Trust then filed their own motion for partial summary judgment, urging that they were entitled to judgment as a matter of law on the claims contained in appellant's complaint, but reserving their counterclaim related to the special assessment. They also filed a terse opposition to appellant's motion for partial summary judgment. On July 6, 1983, the trial court entered an order which, on the authority of D.C. Code § 45–1848(b) (1981), *infra,* denied appellant's motion for partial summary judgment, granted the Association's and the Trust's motion for partial summary judgment, and accordingly, dis-

missed appellant's complaint with prejudice. By its order, the court deferred consideration of the Association's counterclaim against appellant for his failure to pay the special assessment.

On January 26, 1984, a non-jury trial was held on the Association's counterclaim which resulted in a judgment for the Association in the amount claimed for the special assessment, $707.27, plus a $50 late fee, interest at the compounded rate of 10% per annum from December 8, 1982 until paid, and costs. The court indicated that an award of attorney fees to the Association was appropriate and, consequently, agreed to consider further submissions by the parties on this subject. By an order dated April 16, 1984, the trial court awarded the Association $10,000 in attorney fees on the basis of "the length of time invested in the suit, the character of the action, and the actual fees attendant to the condominium association itself." Appellant subsequently filed a motion to amend the order to include findings of fact and conclusions of law. The motion was granted and, on October 29, 1984, the trial court filed a comprehensive order. The court confirmed its earlier award of $10,000 as fees reasonably incurred by the Association in defending itself in the initial suit brought by appellant and in pursuing its counterclaim for the special assessment and late fees. The court observed:

> The entire proceeding arises out of the alleged default by Mr. Ochs. The two issues raised by the pleadings and decided by the court—the validity of the easement and the validity of the special assessment—are inextricably linked. Establishing the validity of the easement was a prerequisite to recovery of the special assessment by the Association.

Appellant then appealed this judgment, as well as the trial court's earlier judgments which summarily disposed of his claim against the Association and the Trust, and which held him liable for the Association's special assessment and attendant late fees.

## III

A. Appellant's first four contentions pertain to the trial court's grant of summary judgment to appellees on his initial claim which, as we have noted, sought a declaration that the conservation easement grant was invalid, as well as related compensatory and punitive damages. Specifically, appellant contends that (1) D.C. Code § 45–1848(b) (1981), *infra*, upon which the trial court based its decision, is subordinate to, or should be read together with the common law rules of tenancies in common which preclude the type of encumbrance here conveyed; (2) the Condominium Declaration and By-laws, and *id.* §§ 45–1821(f) and 45–1838(e), prohibited the Association from encumbering his undivided percentage interest in the building's facade, a common element; (3) the execution of the conservation easement deed deprived him of a vested property interest in violation of the due process clause of the Fifth Amendment; and (4) the Board of Directors obtained the necessary unit owner votes by procedures violative of the condominium instruments and *id.* § 45–1845(d).

It is settled now that summary judgment is proper only where the pleadings, depositions, and other papers on file reveal that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Super Ct.Civ.R. 56(c); *Burt v. First American Bank*, 490 A.2d 182, 185 (D.C.1985) (citations omitted). On review of a grant of summary judgment, it is, of course, this court's obligation to conduct an independent review of the record and to apply the same standard. *Id.* at 184–85 (citations omitted); *Milton Properties, Inc. v. Newby*, 456 A.2d 349, 354 (D.C.1983). In our view, the trial court here correctly determined that on appellant's claim there was no genuine issue as to any material fact and that appellees were entitled to judgment as a matter of law.

In so holding, the court properly applied D.C.Code § 45–1848(b), which reads:

Except to the extent prohibited by the condominium instruments, and subject to any restrictions and limitations specified therein, the executive organ of the unit owners' association, if any, and if not, then the unit owners' association itself, shall have the irrevocable power as attorney-in-fact on behalf of all unit owners and their successors in title to *grant easements through the common elements* and accept easements benefiting the condominium or any part thereof. [Emphasis added.]

Because there was no factual dispute regarding the nature of the easement, the trial court was entitled to decide, as a matter of law, whether it was properly granted by the Board to the Trust pursuant to § 45–1848(b).

▆ Unmistakably, in the planning stages the Board was working under the assumption that two-thirds of the unit owners would have to assent to the conveyance of the conservation easement to the Trust. Indeed, if the Board had thought otherwise, it would not have circulated the initial ballot respecting the proposed easement to all unit owners. But in our view, this assumption was erroneous. Section 45–1848(b) vested authority in the Board to grant the conservation easement in question without approval by the unit owners. As the "executive organ" of the Association,[1] the Board was empowered "to grant easements through the common elements," as it did here by conveying the "Conserva-

tion Easement Deed of Gift" in the building's facade to the Trust.

Given this statutory authority, the only question is whether such authority was prohibited by, or subject to any restrictions and limitations specified in the Association's condominium instruments. *Id.* § 45–1848(b). We have closely examined these instruments (the Condominium Declaration and By-laws) and have found nothing which would in any way prohibit or restrict the Board's power to act as attorney-in-fact on behalf of the unit owners to grant an easement in the facade of the condominium building. Consequently, on the basis of the unambiguous import of § 45–1848(b), we hold that the Superior Court did not err in rejecting appellant's challenge to the conveyance of the conservation easement to the Trust.

▆ Appellant's related claims concerning the validity of the easement conveyance are without merit.[2] Appellant maintains that execution of the easement deed deprived him of a vested property interest in violation of the due process clause of the Fifth Amendment. This argument must fail as it takes " 'significant government involvement' in order for the challenged action to fall within the ambit of the constitutional protection." *Bryant v. Jefferson Federal Savings and Loan Association,* 166 U.S.App.D.C. 178, 180, 509 F.2d 511, 513 (1974) (citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Reitman v. Mulkey,*

---

1. In Paragraph 4.1 of the Condominium Declaration (as amended), and in By-laws Article IV, 4.1, the Board of Directors is defined as the "Executive Organ" of the Association within the meaning of the Condominium Act.

2. Two of these claims may be dismissed with little discussion. First, we need not decide whether the common law rules of tenancies in common would preclude the action taken by the Board of Directors in the case at bar, for the District of Columbia City Council has passed specific legislation, *i.e.,* § 45–1848(b), permitting the action here challenged—the Board's granting of an easement through a common element.

Secondly, nothing in the Condominium Declaration or By-laws, or for that matter the statu-

tory authority cited by appellant, D.C. Code §§ 45–1821(f) and 45–1838(e) (1981), would divest the Board of such authority. Sections 45–1821(f) and 45–1838(e) of the Condominium Act preclude certain action which would affect unit owners' interests in condominium common elements. However, even if read to proscribe the easement grant to the Trust, those sections, by their terms, are subordinate to conflicting provisions of the Condominium Act. And section 45–1848(b) necessarily permits the infringement of unit owners' interests in common elements, as it empowers the executive organs of unit owner associations to grant easements through condominium common elements.

387 U.S. 369, 380, 87 S.Ct. 1627, 1633, 18 L.Ed.2d 830 (1967)). Since the only government action complained of here is the City Council's promulgation of § 45–1848(b), we hold that appellant's constitutional claim is insufficient as a matter of law.[3] *Cf. Bryant, supra,* 166 U.S.App.D.C. at 180–81, 509 F.2d at 513–15; *Bichel Optical Laboratories, Inc. v. Marquette National Bank of Minneapolis,* 487 F.2d 906, 907 (8th Cir.1973); *Adams v. Southern California First National Bank,* 492 F.2d 324, 330–31 (9th Cir.1973), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974).

And finally, as we have already intimated, since the Board of Directors had statutory authority under § 45–1848(b) to grant the conservation easement without unit owner approval, it is of no significance that an insufficient number of owners' votes may have been properly cast.[4] Consequently, for the aforesaid reasons, the trial court properly granted the Association and the Trust summary judgment on appellant's claim.

B. Appellant next challenges the trial court's ruling that he was liable for the Board's special assessment levied against him for use in financing the conveyance of the conservation easement. Appellant contends that "[t]he special assessment levied by the Board of Directors was not levied against each unit owner in proportion to the share interest of each unit owner as required by the By-laws and D.C. Code § 45–1852 (1981), and was not an assessment authorized under the By-laws or the D.C. Condominium Act."[5]

■ We have no doubt that the Board could lawfully assess appellant for his share of the cost of financing the conveyance of the conservation easement. Article VI, 6.1(C) of the By-laws provides that "[a] Unit Owner shall be personally liable for all lawful assessments, or installments thereof, levied against his Condominium Unit...."[6] A unit owner may be *specially assessed* under By-laws Article VI, 6.1(E), which provides in pertinent part as follows:

> *Special Assessments.* In addition to the assessments authorized above, the Board of Directors may levy a special assessment for the purpose of defraying the cost of any unexpected repair *or other nonrecurring contingency,* or to meet any deficiencies occurring from time to time.... Any such special assessments shall be assessed in the manner set forth in Paragraph D of this Section 6.1 ... with respect to additional assessments payable to the reserve fund for capital improvement, replacements and major repairs. [Emphasis added.]

It is fair to say that the assessment for the conservation easement was for the purpose of defraying the cost of a "nonrecurring contingency," *i.e.,* the easement in perpetuity to the Trust.

---

3. Indeed, § 45–1848(b) is subject to the restrictions and limitations specified in condominium instruments. Thus, its application can be avoided altogether if a condominium association so decides.

4. By this statement, we are not suggesting that this may have been the case, only that this issue need not be reached. And, for this reason, appellant's reliance on § 45–1845(d) does not help him. In any event, appellant's position draws little sympathy for, as the records bears out, two-thirds of the unit owners did eventually approve the easement conveyance.

5. The special assessment was worded in part as follows:

> For the sole complete purpose of executing a conservation easement as defined in ... the Internal Revenue Code ... the West End Condominium Unit Owners Association authorizes a special assessment of $17,263 for defraying and meeting all costs incurred for such act.... All unit owners will be assessed in proportion to their ownership percentage in the Condominium, except that the unit owner of units 102 and 106 will not be assessed any amount for such assessment and such assessment is waived for that unit owner, with the increment that would otherwise be due from units 102 and 106 being apportioned among the remaining unit owners in proportion to their percentage interest in the building.

6. Paragraph 21 of the Condominium Declaration also contains such a provision.

■ Appellant nevertheless complains that he has been wrongfully burdened with a portion of another's share of the special assessment. We cannot agree. It is true that the Board of Directors did not assess the owner of two units in the building because, as a non-United States federal income taxpayer, he could not reap the charitable deduction benefits of the easement. But the authority for assessing around this individual is contained in D.C. Code § 45–1852(b), applied by the trial court, which reads:

> (b) To the extent that the condominium instruments expressly so provide, any other common expenses benefiting less than all of the condominium units ... shall be specially assessed against the condominium unit or units involved, in accordance with such reasonable provisions as the condominium instruments may make for such cases.

Appellant suggests that the condominium instruments do not "expressly so provide," and points to By-laws Article VI, 6.1(E), which provides that special assessments "shall be assessed in the manner set forth in Paragraph D of this Section 6.1." The applicable portion of Section 6.1(D) states that an assessment shall be levied against the unit owners "in proportion to the respective Par Value of their Units."

■ By-laws Article VI, 6.6, however, would appear to satisfy § 45–1852(b)'s requirement that the condominium instruments expressly allow for disproportionate assessment since it provides in part that:

> Whenever in the judgment of the Board of Directors the Common Elements shall require additions, alterations or improvements costing in excess of $5,000 during any period of 12 consecutive months, and the making of such additions, alterations or improvements shall have been approved by the Unit Owners of apartment units to which a majority of the votes in the Association appertain, the Board of Directors shall proceed with such additions, alterations and improvements and shall assess all Unit Owners for the cost

thereof as a Common Expense.... Notwithstanding the foregoing, if, in the opinion of not less than 80% of the members of the Board of Directors, such additions, alterations or improvements are exclusively or substantially exclusively for the benefit of the Unit Owner or Unit Owners requesting the same, such requesting Unit Owner or Unit Owners shall be assessed therefor, in such proportion as they jointly approve, if more than one Unit Owner, or, if they are unable to agree thereon, in such proportions as may be determined by the Board of Directors.

In our opinion, this by-law, though admittedly ambiguous, vested discretion in the Association's Board of Directors to assess around the non-United States taxpayer-unit owner, who would be unable to take advantage of the charitable deduction concomitant with conveyance of the conservation easement.

C. Appellant urges finally that the trial court abused its discretion in awarding the Association $10,000 in attorney fees. He submits in this regard that while the Association may have been entitled to attorney fees in connection with its counterclaim—related to the special assessment—it was not entitled to an award for fees incurred in defending his initial challenge to the grant of the easement. The trial court thought otherwise, ruling that appellant was liable for the Association's fees for the related causes on the ground that appellant's claim and the Association's counterclaim were "inextricably linked," and saying further that "[t]he parties should not simply pay their own costs. Plaintiff put the Association to extraordinary expense on a novel issue because he did not accept the will of the majority of the Association members."

Article XI, 11.1 of the Condominium By-laws provides:

> A default by the Unit Owner shall entitle the Association acting through the Board of Directors ... to the following relief: ...

C. *Costs and Attorney's Fees.* In any proceeding arising out of any alleged default by a Unit Owner, the prevailing party shall be entitled to recover the costs of the proceeding, and such reasonable attorney's fees as may be determined by the court.

As expressed in this article, the proceeding must arise out of an "alleged default" by a unit owner. Therefore, there is support for the Association's position that it is entitled to reasonable attorney fees in connection with the adjudication of its counterclaim, a proceeding which stemmed from appellant's default in paying the special assessment.

It is our view, however, that the Association is not entitled to reimbursement from appellant under Article XI, 11.1(C), for the fees it incurred in defending his challenge to the conveyance of the conservation easement. While the two causes—appellant's claim and the Association's counterclaim— are undoubtedly related, we cannot say that the initial proceeding arose from any default by appellant. *See Cohan v. Riverside Park Place Condominium Association, Inc.,* 123 Mich.App. 743, 333 N.W.2d 574, 577 (1983). Rather, this proceeding arose from appellant's challenge to specific action taken by the Association through its Board of Directors. *See id.* Consequently, Article XI, 11.1(C) cannot be relied on for the relief the Association sought and was granted—an award for attorney fees based upon the entire litigation.[7]

Apart from this, we are required to follow "the so-called American rule, which makes each litigant in a civil action, irrespective of the outcome of the case, shoul-

der the burden of paying his own lawyer." *Rachal v. Rachal,* 489 A.2d 476, 480 (D.C. 1985) (Reilly, J., concurring) (citing *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and *In re Antioch University,* 482 A.2d 133 (D.C.1984)); *see Zapata v. Zapata, supra* note 7, 499 A.2d at 910. Accordingly, we hold that the court erred in awarding attorney fees related to the Association's defense of appellant's claim.[8] On remand, the trial court shall determine reasonable attorney fees in relation solely to the prosecution of the Association's counterclaim.[9]

*Reversed in part and remanded for further proceedings consistent with this opinion.*

---

**7.** Of course, if appellant had sued the Association in bad faith, or had otherwise maintained an unfounded action, it would have been within the trial court's discretion to award attorney fees on that basis. *E.g., Zapata v. Zapata,* 499 A.2d 905, 910 (D.C.1985). However, nothing in the record before us convinces us that this action was so conceived or maintained.

**8.** Quite some time after oral argument in this case, this court granted the Association's motion for leave to file a post-argument supplemental brief on the attorney fees issue. We have con-

sidered its supplemental brief, and authority cited therein, *e.g., Erickson Enterprises, Inc. v. Louis Wohl & Sons, Inc.,* 422 So.2d 1085 (Fla. App.1982), as well as appellant's post-argument supplemental reply brief, in reaching our decision.

**9.** We note finally that the result reached here on the attorney fees issue could have been avoided by the Association had it more providently worded the pertinent provision of the condominium instruments.