Wade HOWELL, d.b.a. Howell
Construction, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 97–849 C.

United States Court of Federal Claims.

Jan. 17, 2002.

## OPINION AND ORDER

TURNER, Judge.

This case involves contract claims against the United States. In 1990, the Farmers Home Administration (FmHA) awarded to plaintiff a series of ten indefinite-quantity services contracts for the mowing and maintenance of properties owned by the FmHA in various counties throughout Florida. Plaintiff contends that the contracts had "guaranteed minimum" clauses which required payments to him when no services were ordered. Defendant contends that the contracts contained no obligation for payment when services were not performed; defendant also asserts the affirmative defense of accord and satisfaction. A trial was held in Gainesville, FL, on February 13-14, 2001; after post-trial briefing, final argument was conducted on September 21, 2001. We conclude that plaintiff is entitled to judgment in the principal amount of $8,998.16.

### I

Although this case involves ten separate contracts, except for items particular to specific counties (e.g., number of properties, number of acres held in each area and price), the contracts are identical. Consequently, as was done at the trial, *see* Tr. (2/13/01) at 108-09, we hereafter refer to Contract 60-421-E-1-C0058 ("C0058" or "the Chipley contract") as representative of the terms found in each contract.[1] DX 202/49-102.

William H. Ogle, Ormond Beach, FL, for plaintiff.

Kenneth S. Kessler, with whom were Acting Assistant Attorney General Stuart E. Schiffer, David M. Cohen, James M. Kinsella, Washington, DC, for defendant.

In July 1990, FmHA began to seek proposals on minor maintenance and mowing/bush hogging services for vacant FmHA farm properties located in ten counties in Florida between October 1, 1990 and September 30, 1991. DX 202/59. Each proposal provided an estimated number of FmHA properties in

---

1. The major terms that differ among the ten contracts are as follows:

| Contract # | Area | Properties | Acres | Estimated Price |
|---|---|---|---|---|
| C0053 | Blountstown | 1 | 9 | $ 1,558 |
| C0058 | Chipley | 6 | 797 | $11,914 |
| C0059 | Leesburg | 2 | 46 | $ 2,002 |
| C0060 | Live Oak | 2 | 275 | $ 4,750 |
| C0061 | Marianna | 6 | 500 | $ 8,350 |
| C0062 | Plant City | 4 | 53 | $ 2,536 |
| C0063 | Quincy | 3 | 521 | $ 7,702 |
| C0064 | Tallahassee | 4 | 920 | $12,940 |
| C0066 | Holmes/Bonifay | 8 | 1719 | $23,428 |
| C0067 | Bronson | 6 | 340 | $ 6,430 |

that county, along with an estimated number of acres for mowing. DX 202/68. In August 1990, plaintiff Wade Howell, a sole proprietor doing business as Howell Construction, submitted offers for services in the ten counties. DX 202/59. On September 17, 1990, Betty C. McMurtry, the Contracting Officer (CO), accepted these offers and awarded to plaintiff the ten contracts at issue. DX 202.

Section B.2 (the Price Schedule) of each contract is a document partially created by the CO and completed by an offeror. The CO would estimate the number of properties to be covered by the contract in each county, as well as the total number of acres each contract represented.[2] Tr. (2/13/01) at 53–54 (Browning). Then, an offeror would fill in the price bid for each of the services listed on the Price Schedule. Tr. (2/13/01) at 52–53 (Browning). The CO then accepted an offer based on the Price Schedules submitted, and the Schedule of the winning offeror became part of the contract. Tr. (2/13/01) at 63–64 (Browning).

During the contract year (October 1, 1990 through September 30, 1991), mowing services were ordered on five properties covered by three of these contracts, one property under Contract C0058 (Chipley), two properties under C0060 (Live Oak) and two properties under C0063 (Quincy). Tr. (2/13/01) at 103–04 (Howell); DX 202/63, 202/168, 202/318.

After the close of the contract year, plaintiff became convinced that defendant owed him for potential services that he had not been called upon to perform. On August 7, 1992, plaintiff submitted an invoice in the amount of $93,288 for services he believed were called for in the remaining seven contracts with respect to which he was not called upon to perform any services. DX 210/3–9. In that invoice, plaintiff claimed that he was

entitled to an amount equaling one "Initial Service"[3] for each property and two mowings for the total acreage listed in Section B.2 of the contracts when awarded.[4]

On September 22, 1992, CO McMurtry wrote to plaintiff refusing payment on the invoice as submitted but stating that "in Section I.3, the Government established that it would order a minimum quantity...." DX 209/2. CO McMurtry calculated the required minimums as follows: C0053 (Blountstown), $200; C0059 (Leesburg), $200; C0061 (Marianna), $1,000; C0062 (Plant City), $200; C0064 (Tallahassee), $1,000; C0066 (Bonifay), $2,000; and C0067 (Bronson), $500, for a total of $5,100. DX 209. No explanation for the methodology used to calculate such minimum guarantees has been provided. The CO stated that she was "prepared to approve and to process a claim for those minimum delivery quantities that are guaranteed under the above noted contracts." DX 209/2. Thereafter, on April 9, 1993, plaintiff submitted an invoice for $5,100, on which he marked "per Mrs. McMurtry instructions." DX 210/2. In response, a U.S. Treasury check in the amount of $5,100 was issued to and cashed by plaintiff. DX 211/5.

At trial, defendant maintained that this payment of $5,100 represented the satisfaction of an agreement between the parties to settle all of plaintiff's claims under the ten contracts. Tr. (2/13/01) at 27–31. Plaintiff denied that he had ever agreed to accept $5,100 as payment in full for the $93,288 he invoiced to the government in August 1992. Pl. Br. (7/30–1) at 8–10.

On December 16, 1997, plaintiff filed the complaint initiating this case, claiming $135,249.40 representing the amounts invoiced to the FmHA in August 1992 on the seven contracts for which no work was per-

---

**2.** These figures were arrived at using FmHA Form 1955–62, a Request for Contract Services for Custodial/Inventory Property or Program Services submitted by a County Supervisor to the FmHA office awarding the contracts. Tr. (2/14/01) at 229 (McLeod); DX 201.

**3.** An "Initial Service" is a first-time inventory, inspection and clean-up of a property. It is typically performed if a residence is located on

the property, but it is not always necessary. Tr. (2/13/01) at 158–59 (Howell).

**4.** Later, plaintiff expanded his claim of entitlement to payment for services not performed by including potential additional services under the three contracts pursuant to which some mowing was ordered and performed, less the amount he was paid for the services actually performed. DX 217.

formed, plus the estimated additional amount due under the three contracts for which mowing had been ordered, less the $5,100 that he had already been paid. DX 217.

## II

A standard mowing-service contract format, in use by the FmHA for several years, formed the basis for these contracts. Tr. (2/13/01) at 51 (Browning). For the 1990–91 contract year, a new provision, C.7, was added to the contract. Tr. (2/13/01) at 85–86 (Howell). Section C.7 provided: "Additional mowing of the farm acreage will be decided by the COR [Contracting Officer's Representative] but shall not be less than twice during the 12–month contract period." DX 202/71. According to the testimony of plaintiff, CO McMurtry inserted this provision because in prior years, not all CORs would order at least two mowings per year of each property, and adding this provision would ensure that a minimum level of caretaking service was performed for each property. Tr. (2/13/01) at 85–86 (Howell). Both witnesses who were employees of FmHA agreed that semi-annual mowing was the minimum required to maintain the property. Tr. 57 (Browning); Tr. 288 (McLeod).

The contracts purported to be "indefinite-quantity" contracts, incorporating FAR clause 52.216–22. DX 202/86. Section I.3 stated:

(a) This is an indefinite-quantity contract for the . . . services specified, and effective for the period stated, in the Schedule. The quantities of . . . services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the . . . services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of . . . services designated in the Schedule as the "minimum."

DX 202/86.

Interestingly, there are two portions of the contracts labeled "Schedule." First, Part I of each contract is called "The Schedule," and includes Sections A, B, C, E, F, G, and H. DX 202/59, 202/66. Sections B.1 and B.2 collectively are called the "Price Schedule." DX 202/66. Section B.1 states:

The Contractor/Offeror shall provide the services described in Section C, Statement of Work, of this solicitation at a fixed price specified in B.2 for the County(s) specified in B.2 and in Section C.

. . . .

Quantities established in B.2 are estimates, only.

DX 202/66.

As discussed above, section B.2 is a two-page document that was completed by the CO (for solicitation) and the contractor (for bidding). The first page lists, among other things, (1) the estimated number of properties that FmHA owned within the county covered by that contract, (2) the estimated total number of acres that FmHA owned within the area covered by that contract, and (3) the contractor's price for each service listed, including Initial Services (at $450 per property), Bushhogging/Mowing (at $12 per acre), and Miscellaneous Services (at $11 per hour, up to $1,000 per property). DX 202/68. The second page of B.2, also called "2nd Addendum," was written entirely by plaintiff. Tr. (2/13/01) at 103 (Howell). It represents changes sought by plaintiff from the standard contract terms and was ultimately accepted as part of each contract. The addendum includes a provision stating: "If less than forty (40) acres per tract, a minimum of $500.00 per tract unless arranged with C.O.R." DX 202/69.

At the heart of this dispute is the proper interpretation of sections B.1, B.2, C.7, and I.3 of the contracts. Plaintiff contends that he is entitled to be paid for one Initial Service and two mowing/bushhogging services on each property listed in section B.2 of each contract. Defendant contends that plaintiff is entitled to no additional payment, as section B.2 represents only estimated services and there was no guaranteed minimum in the contracts.

## III

### A

Defendant emphasizes section I.3 of each contract, which clearly states that the agreement is an "indefinite-quantity" contract, as well as the long-standing legal requirement that an indefinite-quantity contract state an ascertainable minimum quantity in order to make the contract valid. Def. Br. (7/16/01) at 19–20; *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923); *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302 (Fed.Cir.1998); *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343 (1980). Defendant argues that because section I.3 says "[t]he Government shall order at least the quantity of ... services designated in the Schedule as the 'minimum'" and because there is no provision of the contracts clearly marked "Schedule" that states a clear minimum quantity of services that must be ordered, the seven contracts under which no services were ordered are invalid and unenforceable. Tr. (2/14/01) at 250–51 (McLeod); Def. Br. (7/16/01) at 19–22.

Plaintiff agrees that no specific definition of the amount of the minimum is made in the contracts. Pl. Br. (4/16/01) at 1. However, plaintiff argues that section C.7 of the contracts provides: "Additional mowing of the farm acreage will be decided by the COR but shall not be less than twice during the 12–month contract period." Pl. Br. (4/16/01) at 9; DX 202/71.

Plaintiff asserts, on the basis of this provision, that C.7 requires two mowings annually and that because an Initial Service is usually performed before the first mowing, each contract calls for, as a minimum, one Initial Service and two mowings of each property listed in section B.2 of each contract. We disagree.

Although section C.7 is among the provisions designated as "The Schedule" on the face sheet (Standard Form 33) of each contract, DX 202/59, this section is not expressly designated as a "minimum" as apparently contemplated in section I.3(b) of each contract, thus precluding a finding that the minimum is to be found in that section. Furthermore, we note that in each of the three

contracts for which a mowing was ordered, no Initial Service was ordered. DX 202/63, DX 202/168, DX 202/318. This fact undercuts plaintiff's argument that he is entitled to be paid for an Initial Service on each property.

Defendant argues that the "Schedule" referred to in section I.3(b) is located at Part I, sections A & B, and that "[n]either section designates a minimum quantity of services to be ordered." Def. Br. (7/16/01) at 20. Although we disagree with defendant's assertion that the "Schedule" is limited to Part I, sections A & B—the face sheet of each contract, see, e.g., DX 202/59, indicates that "The Schedule" includes sections A, B *and* C (as well as E through H)—it is true, as noted above, that section C.7 does not expressly designate such second mowing as a "minimum" as apparently contemplated in section I.3(b) of each contract.

Further, even under plaintiff's interpretation, a contractor would be entitled to compensation for a second mowing under a particular contract *only* if the FmHA had issued a task order for an earlier mowing. Thus, section C.7 could not be relied upon as the guaranteed minimum in the seven contracts under which no services were ordered.

We must decide whether the omission of a clearly expressed "minimum" means that seven of the supposed contracts are unenforceable for lack of a minimum guarantee or if something else may supply that requirement. Further, with respect to the three contracts under which some work was ordered, we must resolve whether plaintiff is entitled to additional compensation for work not performed.

### B

■ There is a general principle of contract law that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential ...," a court may supply that missing term. Restatement (Second) of Contracts § 204 (1981). No court, to our knowledge, has decided the application of section 204 to indefinite-quantity contracts in which the parties have failed to state a minimum

quantity term, yet otherwise expressed a clear intention to obligate themselves. Thus, we believe that this is a case of first impression concerning application of section 204 in these circumstances.

Section 204 states in full: "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1981). Before a court can supply a missing essential term, however, it must find that the parties have, in fact, entered into a contract, as comment a to section 204, states: "This section states a principle governing the legal effect of a binding agreement." Restatement (Second) of Contracts § 204 cmt. a (1981). Thus, we must first determine whether an indefinite-quantity agreement can be enforceable despite the lack of an ascertainable minimum quantity term where the written agreement clearly states that the buyer must order "the quantity of ... services designated [in the agreement] as the 'minimum.'" DX 202/86.

In an indefinite-quantity contract, the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods or services the buyer chooses to purchase from the seller. The buyer is not obligated to purchase all of its requirements from the seller. However, it has long been stated in case law that the buyer must be obligated to purchase a minimum quantity in order for the agreement to be enforceable. "With indefinite quantity contracts ... the buyer's promise specifically is uncertain, and such a contract would fail for lack of consideration if it did not contain a minimum quantity term." *Torncello v. United States*, 231 Ct.Cl. 20, 28, 681 F.2d 756, 761 (1982) (citing *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923)); *Mason v. United States*, 222 Ct.Cl. 436, 443 n. 5, 615 F.2d 1343, 1346 n. 5 (1980). In addition to sufficient consideration, courts have required "mutuality" in indefinite-quan-

tity contracts, or that real, not "illusory," promises be exchanged. *Willard, Sutherland & Co.*, 262 U.S. at 493, 43 S.Ct. 592; *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1306 (Fed.Cir.1998).

On occasion, courts have sought to "save" otherwise "unenforceable" contracts by interpreting them as requirements contracts. *Crown Laundry and Dry Cleaners, Inc. v. United States*, 29 Fed.Cl. 506, 517 (1993). Here, we are dealing with indefinite-quantity contracts (expressly so defined on their face, DX 202/86) which cannot plausibly be interpreted as requirements contracts.

Unquestionably, the contracts at issue lack a clearly ascertainable minimum quantity term. However, because this case can be distinguished from *Willard* and its progeny, we conclude that the seven contracts for which no services were ordered are enforceable. After explaining how the parties' bargain here constitutes a "binding agreement," as required for a court to supply a missing essential term, we will complete our application of section 204 by supplying terms "reasonable in the circumstances."

### C

Courts have declared indefinite-quantity contracts without a minimum quantity term unenforceable primarily for "lack of consideration." While concepts of consideration have not always been uniform, current usage seems to have settled on the Restatement's "bargained-for exchange" definition of consideration.[5] Some have argued that the consideration requirement is "designed primarily to protect the promisor from being compelled to perform donative promises." 2 Corbin On Contracts § 5.2 (1995).

Stated another way, consideration in the form of a bargained-for exchange is simply evidence that the promisee's expectation of performance is reasonable, and not disingenuous reliance on the words of a nonserious and unwilling promisor. This is consistent with the views of other commentators

---

5. The Restatement provides that "[t]o constitute consideration, a performance or a return promise must be bargained for," that is, "sought by the promisor in exchange for his promise and ... given by the promisee in exchange for that promise." Restatement (Second) of Contracts § 71(1) & (2).

who have argued persuasively that consideration serves an evidentiary function, that is, it demonstrates the parties' mutual intent to be bound and that a promise was actually made. *Id.* (citing Oliver W. Holmes, Jr., *The Common Law* 253–59 (1881)). Thus, if consideration serves primarily an evidentiary function, an indefinite-quantity contract should not be declared unenforceable for lack a minimum quantity term where sufficient alternative evidence is presented to demonstrate that the parties have otherwise made a bargained-for exchange of promises and intended to be bound. We find that in this case there is sufficient evidence to show that the parties intended to be bound and, indeed, presumed that they were.

**D**

■ Here, plaintiff and defendant did make a bargained-for exchange of promises, despite the lack of a stated minimum quantity term. Defendant promised to order *some* guaranteed minimum quantity of services in exchange for plaintiff's promise to stand ready to perform the services covered by the contract. DX 202/71, 202/86. Furthermore, the cautionary and evidentiary functions of a bargained-for exchange were enhanced here by the formal bidding process conducted by the parties. The parties would not have taken the pains to engage in the formal bidding process—in which they recognized that a guaranteed minimum was essential for the type of contract expressly contemplated, DX 202/57 & 86—had they not intended to enter into binding agreements.

Additionally, each contract contains a clear, express provision that indicates defendant was obligated to order some guaranteed minimum quantity of services. DX 202/86. Section I.3 recites the language of FAR 52.216–22 stating that the government is required to "order at least the quantity of supplies or services designated in the Sched-

ule as the 'minimum'." DX 202/86. Section I.3 apparently provided a key basis for the parties' mutual understanding that defendant was obligated to order, and plaintiff obligated to supply, some guaranteed minimum quantity of services. Pl. Br. (4/16/01) at 6; Def. Br. (7/16/01) at 19–20.

Finally, the parties' conduct is evidence that they believed to have entered into enforceable contracts with some minimum guarantee. The government's belief that it had entered into an enforceable agreement is demonstrated by a meeting between CO McMurtry and plaintiff during the post-award stage, at which CO McMurtry admonished plaintiff that the contract called for him to be on site within 72 hours after the issuance of a work order. Tr. (2/13/01) at 156–57 (Howell). Furthermore, the parties' mutual belief that the contract contained a minimum guarantee is supported by plaintiff's trial testimony, Tr. (2/13/01) at 80–84 (Howell), and CO McMurtry's acknowledgment of the requirement and existence of a guaranteed minimum in two letters, as well as in a memorandum to her file.[6] All of this evidence demonstrates that the parties made a bargained-for exchange of promises and that the parties' clear intent was to be bound to some minimum guarantee.

**E**

Having found a bargained-for exchange of promises and sufficient evidence to demonstrate an intent on behalf of the parties to be bound, we must address the conclusion reached in earlier cases that indefinite-quantity contracts lacking a minimum quantity term are unenforceable for lack of "mutuality." *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 493, 43 S.Ct. 592, 67 L.Ed. 1086 (1923); *Coyle's Pest Control, Inc. v. Cuomo,* 154 F.3d 1302, 1306 (Fed.Cir. 1998); Donald G. Gavin, *Government Re-*

---

**6.** A letter, written by CO McMurtry to Mr. Howell on September 22, 1992, stated: "I am prepared to approve and to process a claim for those minimum delivery quantities that are guaranteed under the ... contracts." DX 209/2. On November 2, 1996, CO McMurtry wrote a memorandum to her file which stated: "Each contract was an indefinite delivery, indefinite quantity

with a minimum guarantee." DX 218. Finally, in an October 2, 1995 letter to Eunice Luke, Assistant Regional Attorney, USDA, CO McMurtry wrote that "[t]he contracts in question were indefinite delivery, indefinite quantity with minimum guarantees," and "USDA–FmHA owes Mr. Howell several thousand dollars for minimum guarantees...." DX 230/1.

*quirements Contracts,* 5 Pub.Cont.L.J. 234, 240–44 (1972).

■ When it is said that a contract fails for lack of mutuality, it is another way of saying that a promise is "illusory," that is, that the maker of a promise has in no way obligated himself or placed any limitation on his freedom of choice whether to perform. *Torncello v. United States,* 231 Ct.Cl. 20, 28, 681 F.2d 756, 761 (1982); *Mason v. United States,* 222 Ct.Cl. 436, 443, 615 F.2d 1343, 1346 (1980). Because we believe that *Willard* and *Coyle's* can be sufficiently distinguished from this case, and that defendant's freedom of choice was not unconstrained, we find that the parties' agreement is not "illusory," and is, therefore, enforceable.

■ The coal supply contract at issue in *Willard* specifically and clearly stated that the government was not "obligated to order any specific quantity." *Willard, Sutherland & Co. v. United States,* 262 U.S. 489, 493, 43 S.Ct. 592, 67 L.Ed. 1086 (1923). Since the Supreme Court decided *Willard* in 1923, however, Congress authorized promulgation of FAR 52.216–22 ("indefinite-quantity clause") which must be included in the government's indefinite-quantity contracts and requires the government to order "the quantity of supplies or services designated ... as the 'minimum'." 48 C.F.R. 52.216–22 (1983).

Here, the contracts contained the FAR-mandated indefinite-quantity clause, obligating defendant to order *some* minimum quantity of plaintiff's services. DX 202/86. Thus, the government's duty to order services was not entirely unconstrained as it was in *Willard.* Accordingly, it cannot be said that the contracts suffer the same lack of mutuality that doomed the *Willard* contract.

The contract in *Coyle's,* as in *Willard,* did not contain the FAR-mandated indefinite-quantity clause, even though *Coyle's* was decided well after the clause was adopted in 1983. *Coyle's Pest Control, Inc. v. Cuomo,* 154 F.3d 1302, 1306 (Fed.Cir.1998). Not only was the FAR language absent from the *Coyle's* contract, but there was no evidence that the parties in *Coyle's* even intended to enter into an indefinite-quantity contract, let alone secure some guaranteed minimum obli-

gation. In fact, the *Coyle's* plaintiff argued that the court should have construed the parties' agreement as a requirements contract. *Coyle's Pest Control, Inc.,* 154 F.3d at 1305. Here, the contracts not only contain the FAR indefinite-quantity clause, but the evidence discussed above further demonstrates that the government and plaintiff intended to enter into indefinite-quantity contracts with *some* guaranteed minimum.

Finally, we cannot view defendant's promise here as being entirely "illusory." If a promise is said to be illusory when there are no limitations on the promisor's freedom of choice whether to perform, then defendant's promise here was not illusory. Were defendant's obligation entirely unconstrained, CO McMurtry would not have repeatedly recognized that the government was bound to order services in the amount of a "guaranteed minimum." DX 209/2, 218, 230/1. Despite the lack of a stated minimum quantity term, we cannot find that the contracts here were "illusory" when it is clear that the contracts did not give defendant the freedom to order nothing from plaintiff, but instead obligated defendant to order a "minimum."

■ Having found an agreement sufficiently defined to be a contract, we must continue the application of section 204 to supply a missing essential term, in order to determine the rights and duties of the parties.

**IV**

Section 204 provides that where parties to a binding agreement have not agreed to an essential term, "a term which is reasonable in the circumstances" may be supplied by the court. Restatement (Second) of Contracts § 204 (1981). In supplying a term, comment d of section 204 says that "the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process." Restatement (Second) of Contracts § 204, cmt. d (1981).

For the reasons stated below, we find that a minimum quantity term that is reasonable in these circumstances is $1000 per contract for each of the seven contracts for which no

work was ordered, except the Bonifay contract, for which the guaranteed minimum found by the CO is $2000. DX 209.

██ Courts have not only held fast to the long-standing rule that an indefinite-quantity contract must state a minimum quantity term, but also to the requirement that the stated minimum be more than a nominal amount. *Travel Centre v. Barram,* 236 F.3d 1316, 1319 (Fed.Cir.2001); *Tennessee Soap Co. v. United States,* 130 Ct.Cl. 154, 158, 126 F.Supp. 439, 441 (1954) (superseded by statute as stated in *Gatoil (U.S.A.), Inc. v. Washington Metro. Area Transit·Auth.,* 801 F.2d 451 (D.C.Cir.1986)). The courts' concern with nominal quantity, minimum guarantees is based primarily on the notion that the minimum must reflect a mutuality of obligation. We are precluded here from inquiring whether a stated minimum is non-nominal as these contracts lack a stated minimum, and we have addressed the mutuality issue above. Nonetheless, the non-nominal requirement is instructive in our application of section 204 as to the adequacy of the term we should supply as the minimum.

In supplying this missing, essential term, we initially focus on CO McMurtry's September 22, 1992 letter addressed to plaintiff, which identified what she supposed to be the minimum guarantee for each of the seven contracts for which no work was ordered. DX 209. The alleged minimums ranged from $200 to $2000. *Id.*

For the three contracts where CO McMurtry awarded $1000 or more—C0061 (Marianna), $1000; C0064 (Tallahassee), $1000; and C0066 (Bonifay), $2000—we find no reason to modify her findings concerning the respective minimum guarantees. Because these amounts are non-nominal and are reasonable in the circumstances, we find them to be the minimum guarantees under the Marianna, Tallahassee, and Bonifay contracts, respectively.

However, for the remaining four contracts where CO McMurtry awarded lesser amounts—C0053 (Blountstown), $200; C0059 (Leesburg), $200; C0062 (Plant City), $200; and C0067 (Bronson), $500—we regard these amounts as nominal and, consequently, unsatisfactory. The purported minimum guar-

antee for each of these four contracts, not more than a few hundred dollars, would not have compensated plaintiff for the costs associated with his obligation to stand ready to perform services upon short notice. Tr. (2/13/01) at 91–92 (Howell); DX 202/66 (§ B.1) & 202/70, 71 (§§ C.5–C.7). Nor would such low guarantees adequately recognize plaintiff's inability to "engage in other employment which is incompatible with the [contractor's] duties" under each contract. DX 202/82 (§ H.5). In supplying the missing essential term for these four contracts, a greater, non-nominal amount likely would have been set as the guaranteed minimum.

We believe that $1000 per contract for Blountstown, Leesburg, Plant City and Bronson is an amount that is reasonable and more closely resembles the non-nominal, guaranteed minimum that the parties would have supplied in the circumstances. A $1000 minimum guarantee seems appropriate considering that (1) plaintiff would not have received any amount less than $500 on any given contract, plus a second cutting (again, at no less than $500), had an initial work order for mowing been issued, DX 202/69, and (2) $1000 more closely represents the maximum the government likely would have been willing to pay where plaintiff stood ready to perform, but no work was ordered.

Accordingly, we find that plaintiff is entitled to the guaranteed minimum of $2000 on the Bonifay contract and $1000 on each of the six remaining contracts for which no work was ordered, for a total of $8,000. *See Mid–Eastern Indus., Inc.,* ASBCA No. 53016, 2001 WL 1485691 (Nov. 16, 2001); *Delta Const. Int'l, Inc.,* ASBCA No. 52162, 2001–1 B.C.A. (CCH) ¶ 31, 195, 2000 WL 1721785 (Nov. 16, 2000). This sum must be reduced by the $5,100 which plaintiff has already been paid based on the CO's understanding of the minimum guarantees in the seven contracts, leaving a balance due of $2,900.

## V

██ Next, we turn to defendant's affirmative defense of accord and satisfaction. Defendant argues that the $5,100 payment

that followed CO McMurtry's September 22, 1992 letter to Mr. Howell represents an accord and satisfaction of any claims regarding the seven contracts referenced therein. DX 209; Def. Br. (7/16/01) at 10–17. As with all affirmative defenses, defendant bears the burden of proving accord and satisfaction.

The evidence presented by defendant at trial shows that CO McMurtry wrote a letter dated September 22, 1992 that rejected payment on invoices that plaintiff had previously submitted for services that were never ordered. DX 209. The letter indicates it was intended to be sent by "Certified Return Receipt Mail," referencing a receipt number P404570686. DX 209. Defendant, however, offered no proof beyond testimony of routine office practice that the letter was ever mailed to, or received by plaintiff. Defendant did not produce the receipt, and plaintiff's uncontradicted testimony was that he had not received the letter, or at least had no memory of having received the letter. Tr. (2/13/01) at 169–71, 178 (Howell).

These facts, standing alone, would be sufficient to support a finding that plaintiff did not receive the letter. However, on April 9, 1993, plaintiff submitted to CO McMurtry an invoice in the amount of $5,100, the precise amount stated in her letter that she was willing to pay plaintiff upon submission of a claim. Furthermore, plaintiff had written upon the invoice "... per Mrs. McMurtry instructions." DX 210/2. Plaintiff's actions in conformity with the letter's directives would counterbalance the evidence that he did not receive the letter but for the fact that the plaintiff submitted the invoice nearly six months after the date of the letter and his testimony, again uncontradicted, that he submitted the invoice pursuant to a meeting with CO McMurtry. Tr. (2/13/01) at 179 (Howell).

Plaintiff testified that during this meeting, CO McMurtry instructed him to fill out the invoice in order to receive payment on amounts he maintained were still owed. Tr. (2/13/01) at 179–180 (Howell). Defendant did not rebut the fact that this meeting took place, nor did it offer any evidence that settlement discussions occurred at this meeting. Accordingly, we conclude that plaintiff did not receive CO McMurtry's letter and, consequently, that no accord and satisfaction occurred.

Even if we were to assume that plaintiff received the letter of September 22, 1992, the terms of the letter do not indicate that acceptance of the $5,100 would constitute settlement in full of all claims plaintiff then had against defendant. DX 209. The letter (1) acknowledges receipt of plaintiff's invoices for the seven contracts for which no work was ordered, (2) rejects payment of each, (3) acknowledges that a minimum guarantee was included in each contract, (4) determines the minimum amount payable for each contract, a total of $5,100, (5) directs plaintiff to file a claim for $5,100 and (6) informs plaintiff of his right to follow "Disputes Act" procedures if he disagreed with her determination. DX 209. Further, the letter indicated that the Contracting Officer will "restore funds ... to cover any subsequent claim that [plaintiff] might prepare under the 'Disputes Act'." DX 209/2. Viewing the letter in its entirety, we fail to see how it constituted an agreement to settle his claim in full.

Should there be any remaining doubt that no accord and satisfaction occurred, CO McMurtry's own letters and memorandum written after September 22, 1992 fail to confirm, and in fact contradict, any notion that she had reached a settlement with plaintiff. In a May 23, 1994 letter to plaintiff's counsel, CO McMurtry indicated that plaintiff had been paid for all work, but she did not characterize this payment as having been made in satisfaction or settlement of plaintiff's claims on contracts for which no work was ordered. DX 213.

In an October 2, 1995 letter to Eunice Luke, Assistant Regional Attorney, USDA, CO McMurtry wrote, in complete contradiction to the government's position that she had reached a settlement with plaintiff, that "USDA–FmHA owes Mr. Howell several thousand dollars for minimum guarantees and for work performed for which he would not bill us." DX 230/1. It was not until November 2, 1996 that CO McMurtry characterized the payment of $5,100 to plaintiff as "settlement" on the contracts for which no work was performed. DX 218/2. However, this characterization was made in a memo-

randum for her own case file and, thus, does not convincingly supplant her earlier-communicated position that plaintiff was still owed money for minimum guarantees.

Defendant also introduced a copy of the canceled check of May 7, 1993 in the amount of $5,100. DX 211/5. Defendant argues, without further supporting evidence, that acceptance of this check completed an accord and satisfaction of plaintiff's claims. For reasons already stated, we disagree.

■ Finally, we note that typically in the government-contract setting, settlements of claims are accompanied by formal releases. In many instances such a release precedes or accompanies payment of the claim. No such release was ever presented in relation to this case. Although it is not necessary to have a formal signed release to constitute accord and satisfaction, there must be some indication that both parties acknowledged they were settling a claim with an agreement and payment (or other performance) that extinguished the claim. No such agreement has been proven in this case. Accordingly, we conclude that defendant has not proved accord and satisfaction of plaintiff's claims.

## VI

Finally, plaintiff asserts entitlement to damages for the three contracts for which a mowing was ordered, i.e., C0058 (Chipley), C0060 (Live Oak) and C0063 (Quincy).

During the contract year (October 1, 1990 through September 30, 1991), mowing services were ordered on five properties covered by these three contracts, one property under Contract C0058 (Chipley), two properties under C0060 (Live Oak) and two properties under C0063 (Quincy). Tr. (2/13/01) at 103–04 (Howell); DX 202/63, 202/168, 202/318. The total acreage mowed by plaintiff on these five properties, as evidenced by the task orders issued under each respective contract, was 566.8 acres.[7] DX 202/63, 202/168, 202/318.

Plaintiff seeks payment for an Initial Service and two mowings on each property estimated at the time of contracting, less the amount he was paid for performing the single mowings. We find no support for this interpretation. Section C.7 states that "[a]dditional mowing of the farm [acreage] will be decided by the COR but shall not be less than twice during the 12–month contract period." DX 202/71. While we do not accept plaintiff's argument that this provision provided a mandatory minimum of two mowings for each property in the contracts, we do accept his argument that this provision requires a second mowing if a first mowing was ordered and performed. Accordingly, as to the five tracts totaling 566.8 acres that plaintiff mowed once during the contract year, we conclude that plaintiff is entitled to collect the contract price of $12 per acre, less plaintiff's potential costs avoided because he did not actually perform the work.

For a determination of the proper damages payable for these three contracts we must determine plaintiff's cost-savings. Plaintiff testified that it cost 30 to 50 cents per acre for equipment and mobilization expenses and about 30 cents per acre for fuel. Tr. (2/13/01) at 96 (Howell). We found plaintiff to be a credible witness and conclude that he is entitled to the agreed-upon $12 per acre less 80 cents per acre for the savings resulting from not actually performing the second mowings. However, this cost-savings calculation is incomplete. A cost-savings calculation of 80 cents per acre for acreage mowed once in the Chipley, Live Oak and Quincy contracts does not account for the complete cost of transporting, maintaining, and running his bush-hogging and mowing equipment. Plaintiff's estimated cost-savings of 80 cents per acre should be increased $50 per tract mowed to more accurately reflect his true cost-savings. Accordingly, we find that plaintiff is entitled to $11.20 per acre, less $50 for each of the five tracts for which mowing services were ordered.

---

7. According to the task orders, under Contract C0058 (Chipley) plaintiff mowed 132.4 acres belonging to a Mr. Tommy Peel, under Contract C0060 (Live Oak), 225 acres belonging to a Mr. Thomas Bailey, as well as 80 acres belonging to a Mr. Maxwell Leppec, and under Contract C0063 (Quincy), 30.2 acres belonging to Gretna Farm, and 99.2 belonging to Rubey Headquarters. DX 202/63, 202/168, 202/318.

Plaintiff mowed five tracts one time each, totaling 566.8 acres. For this plaintiff should be paid $11.20 per acre (a total of $6,348.16), less $50 for each of the five tracts for which services were ordered (a total of $250) for a total damage award of $6,098.16 for the three contracts under which work was ordered (the contract price for five "second mowings" less plaintiff's cost savings realized by not performing the services).

## VII

In principal sum, the net total award to which plaintiff is entitled under all ten contracts is $8,998.16, consisting of $2,900 in minimum guarantees remaining due under the seven contracts for which no work was ordered and $6,098.16 remaining due with respect to the three contracts under which work was ordered.

Based on the foregoing, it is ORDERED that judgment be entered in favor of plaintiff in the principal amount of $8,998.16, plus interest as provided in 41 U.S.C. § 611 from September 6, 1992 [8] to date of payment.

Pursuant to RCFC 54(d), costs shall be allowed to plaintiff ("the prevailing party").

8. The parties concur that the CO received plaintiff's claim (documentation satisfying the written-claim requirement of 41 U.S.C. § 605(a) for each of the ten contracts involved in this case) not later than this date. Tr. (9/21/01) at 18–19.