NEST AND TOTAH VENTURE, LLC,
Appellant/Cross–Appellee,

v.

Daniel DEUTSCH, et al.,
Appellees/Cross–
Appellants.

Nos. 09–CV–1149, 10–CV–261.

District of Columbia Court of Appeals.

Argued Jan. 25, 2011.
Decided Dec. 1, 2011.

Roger D. Luchs, with whom Richard W. Luchs, Washington, DC, was on the brief, for appellant/cross-appellee.

Thomas F. Murphy, with whom Robert E. Greenberg, Washington, DC, was on the brief, for appellees/cross-appellants.

Before FISHER, Associate Judge,[*] REID, Associate Judge, Retired,[**] and TERRY, Senior Judge.

REID, Associate Judge, Retired:

This case involves a contract for the purchase and build-out of a dental office in a condominium building, a lawsuit for breach of contract, a counterclaim for construction coordination fees, and a motion for attorneys' fees. Appellant, Nest & Totah Venture, LLC ("NTV"), appeals the trial court's finding of its liability for breach of contract, and the court's decision regarding the award of construction coordination fees. Appellees, Drs. Daniel Deutsch, Marc Doctors, and Sherman Telis, partners in the Washington Center for Dentistry, PC (collectively, "WCD"), cross-appeal the trial court's decision pertaining to the award of attorneys' fees. For the reasons stated below, we affirm the judgment of the trial court with respect to the breach of contract and construction coordination fees, but we remand its judgment regarding the award of attorneys' fees, with instructions to award WCD the total sum of $100,000 in attorneys' fees,—that is, the additional sum of $56,907 which it subtracted from the contract's $100,000 liability cap, without prejudgment interest.

## FACTUAL SUMMARY

### Events Prior to WCD's Lawsuit

The record reveals that NTV owns a condominium building located at 1430 K Street, in the Northwest quadrant of the

---

[*] Judge Kramer was assigned to this case at the time of argument. Following Judge Kramer's retirement on May 1, 2011, Judge Fisher was assigned to replace her on the division. Judge Fisher listened to the tape of the oral argument.

[**] Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

District of Columbia. On June 6, 2006, NTV (represented by its founder and manager, Nicole T. Totah) and WCD (represented by Dr. Deutsch) executed a Purchase and Sale Agreement ("contract") for Unit 800 ("Unit") to house WCD's dental practice. The units in the building were sold in "shell form," which meant that they were unfinished at the time of purchase. Under Section 7.8 of the contract, a purchaser could elect to build out the unit ("Purchaser Build Option"), or could choose to have NTV build out the unit ("Seller Build Option"). WCD selected the Seller Build Option on June 19, 2006.[1]

Although WCD selected the Seller Build Option, it preferred its own contractor, the John Valentine Company ("Valentine"), due to Valentine's experience in building out dental offices. Consequently, Dr. Deutsch met with Karen Powell (Valentine's owner) and Ms. Totah to work out an agreement that would allow Valentine to act as the general contractor for the Unit. The parties agreed that Valentine would perform all of the general contractor duties for the WCD job. To accomplish this end, Valentine would subcontract with NTV's general contractor, Kfoury Construction Group ("Kfoury"), and Kfoury would retain its role as the Designated Contractor. Valentine and WCD memorialized their arrangement in a letter agreement, dated October 22, 2006, approving certain costs.[2] However, neither NTV nor Kfoury entered into a contract with Valentine. NTV and Kfoury executed their agreement in November 2006, for the Build–Out Work for the WCD Unit; this agreement specified that "[t]he Contractor [Kfoury] shall achieve Substantial Completion of the entire Work not later than February 1, 2007." Drs. Deutsch, Doctors, and Telis signed (on November 10, 2006) a letter dated November 2, 2006, which stated, in part: "Please indicate your approval and agreement with [NTV] executing a contract with Kfoury Construction Group to construct the Build–Out Work for Unit 800. . . ." ("November Addendum").

The Build–Out Timeline extended from August 21, 2006 through February 1, 2007, when the Build–Out Work was to be "Substantially Complete."[3] However, as the construction work unfolded, the February 1, 2007 substantial completion date became an issue. On January 2, 2007, WCD sent NTV a letter stating that the February 1, 2007 substantial completion date was no longer realistic, as the Build–Out Work would not likely be complete by then. In-

1. Section 7.10 provided, in part, that if the buyer selected the Seller Build Option, (a) both seller and purchaser would "agree to the timeline of deadlines . . . set forth in Exhibit N (the 'Build–Out Timeline')"; (b) seller agreed to "use commercially reasonable efforts to complete the build-out of the Unit in accordance with the Build–Out Plans"; and (c) purchaser agreed to "pay [s]eller a fee at [C]losing of five percent (5%) of all Build–Out Costs, as a construction coordination fee."

2. WCD's letter agreement with Valentine noted certain items that were "NIC" ("Not In Contract"), such as millwork, ceramic/granite, appliances (to be provided by Dr. Deutsch), window modifications (to be provided by others), and occupancy permit (to be provided by NTV).

3. The contractual definition of "Substantially Complete" in Section 1.1 stated, in part:

"Substantially Complete" means completed in the reasonable written opinion of the applicable architect . . ., except for 'punch-list' and other items that do not materially interfere with the use of the Unit. . . . Purchaser's architect shall determine when the Build–Out Work under the Seller Build Option is Substantially Complete, except that if Seller disagrees with such determination, then Seller's architect, acting reasonably, shall make such determination after consultation with Purchaser's architect. Substantial completion of all other work, including without limitation the Base Building, shall be as determined by the Seller's architect [ ].

stead, WCD advised that it "anticipate[d] a Closing Date on or about February 28, 2007."[4] On January 17, 2007, NTV replied to WCD, pointing out that WCD was responsible for any delays in the substantial completion of the Build–Out Work beyond February 1, 2007. NTV alleged that "[t]he build[-]out was scheduled to be completed by February 1, 2007 per the [contract]," and if not, WCD would be "responsible for the delay and … required under the [contract] to pay [NTV's] costs resulting from the delay."[5] WCD's refusal to do so, NTV alleged, would result "in default[.]" If the Unit was complete, NTV contended that WCD "must close or … be in default of the [contract]."

On January 22, 2007, Ms. Totah sent a letter to Charles Joch, WCD's architect, requesting that he inspect the Unit and provide a written opinion by January 26, as to whether the Unit "will be substantially complete by February 1, 2007." On January 26, after performing his inspection, Mr. Joch notified Ms. Totah that he did not consider the space to be Substantially Complete. Ms. Totah then requested that her own architect, Aaron Thoren, inspect the space to determine whether it was Substantially Complete. Mr. Thoren performed his inspection on January 31, 2007, and sent a memorandum to Ms. Totah notifying her that he considered the Unit Substantially Complete. NTV promptly requested that WCD proceed to closing on February 6, 2007. On February 6, 2007, WCD's attorney sent a letter to Ms. Totah objecting to the Closing Date as premature, as the Unit was not secure, thereby preventing WCD from installing its dental equipment. Ms. Totah claimed

that NTV's carrying costs would be $56,907 if it extended the Closing Date to February 28, 2007. The parties agreed that WCD would place $56,907 in an escrow account while they worked to resolve "the dispute over whether substantial completion ha[d] occurred or the respective parties' liability for delay damages under the contract…." The parties agreed on February 9, 2007, that they would proceed to closing on February 28, 2007, regardless of whether the space was Substantially Complete at that time. The parties closed the sale of the Unit on March 1, 2007.

### WCD's Lawsuit and NTV's Counterclaim

WCD brought an action in Superior Court against NTV alleging breach of contract. WCD asserted that NTV breached the contract when it demanded that WCD close prior to the substantial completion of the Unit, as "[n]either the base building nor the Unit was at a state of Substantial Completion as of February 1st." WCD sought to recover the escrow funds, lost opportunity costs, nominal additional damages, attorneys' fees pursuant to the contract's provisions pertaining to the prevailing party, litigation costs, and prejudgment interest.

NTV counterclaimed, alleging, in part, that WCD breached Section 9.1 of the contract by failing "to settle on the[ ] purchase of the Unit within five days of receipt of notice from Defendants that construction of the Unit was substantially completed." NTV stated that WCD's failure to close caused it to incur a month's worth of "carrying charges," totaling $60,479.56. Further, NTV alleged that

---

**4.** Section 9.1 of the contract, "Closing Date," provided, in part:
 The closing of the transaction … shall occur on (i) the date five (5) business days after the Seller has notified Purchaser … that the Build–Out Work is Substantially

Complete, if the Seller Build Option applies; or (ii) such other date as agreed to in writing between Seller and Purchaser….

**5.** Section 7.5(b) of the contract contained the delay provision for the Seller Build Option.

WCD breached § 7.10(c) of the contract by failing to provide a full accounting of the Build–Out Costs for which it had agreed to pay NTV 5% in construction coordination fees. NTV sought damages "in the amount of $60,479.56, 5% of its build-out costs as set out in the [c]ontract, interest at the statutory rate, from February 1, 2007, reasonable attorneys['] fees, and costs."

### The Trial

The evidence at trial was voluminous, consisting of seven days of testimony before the Honorable Judith Macaluso, and the introduction of numerous exhibits. WCD presented as its witnesses Dr. Deutsch, Charles Joch, its architect; Ms. Powell, and Delmar Joseph Luce, its construction expert. NTV called as its witnesses Sally Levitt, an interior designer of medical and dental offices and WCD's project manager for the interior design of the Unit; Ms. Totah, Dr. Deutsch, and Aaron Thoren, NTV's architect. The testimony primarily concerned two major issues: (1) substantial completion—what constitutes substantial completion under the contract documents and modifications, the agreed upon date for substantial completion, the certification of completion by the architect, and the relationship between what NTV called Kfoury work and nonKfoury work to substantial completion; and (2) the construction coordination fees due and owing to NTV.

### The Trial Court's Decision

In an extensive twenty-one page decision and order of judgment, the trial court concluded that NTV breached its contract with WCD by "(1) prematurely declaring the project was Substantially Complete, (2) demanding that WCD proceed directly to closing, and (3) requiring WCD to place

funds in escrow as a condition to closing on March 1, 2007." The court dismissed NTV's counterclaim as it related to WCD's alleged breach "based upon failure to close on time. . . ." The court awarded WCD the escrow funds plus interest, and 80% of its attorneys' fees, because it was the "substantially prevailing party." However, the court found that WCD was liable to NTV "for 5% of certain build-out costs," which were "unrelated to the controversy existing at the time the escrow fund was established."

### ANALYSIS

■■■ In reviewing judgments rendered from bench trials, "we address legal issues *de novo*"; and although we may review the trial court's factual findings, we will reverse those findings "only if they are 'plainly wrong or without evidence to support [them].'" *Jemison v. National Baptist Convention, USA, Inc.*, 720 A.2d 275, 281 (D.C.1998) (alteration in original) (quoting D.C.Code § 17–305(a) (1997)); *see also* D.C.Code § 17–305(a) (2001).

### NTV's Appeal

NTV contends that WCD failed to meet its burden to establish "by a preponderance of the evidence its charge in Count I of its Complaint ['Breach of Contract—Substantial Completion'], that NTV failed to follow the procedures set forth in the negotiated definition of 'Substantially Complete' included in the [c]ontract." NTV argues that the trial court incorrectly decided in favor of WCD on the substantial completion issue because the trial judge ignored principles of contract interpretation, as well as specific contract provisions,[6] "and imposed her own, misguided

---

**6.** NTV explicitly mentions the following sections of the contract: 1.1 (definitions for Build–Out Plans and Build–Out Work, and Substantially Complete), 7.8 (as it defines Build–Out Work), 9.1 (Closing Date), 12 (default), 15.3 (Time is of the Essence), 15.14 (Entire Agreement), and 15.15 (Amendments to Agreement).

view of what was equitable under a similarly misguided discussion of the facts of the case." NTV (1) emphasizes its view that "[t]he judge's ruling evidences her apparent failure to grasp the distinction between the Kfoury work and the nonKfoury work, the relationship between NTV and Kfoury, and Kfoury and Valentine, and between Valentine and WCD"; (2) faults the judge for "conclud[ing] that Valentine was also NTV's subcontractor/agent for the nonKfoury work"; and (3) in essence maintains that the trial judge misunderstood the "Substantially Complete" concept as defined in the contract, and hence, improperly relied on Mr. Joch's testimony, as well as that of Ms. Powell, with respect to the meaning of that term. Finally, NTV appears to claim that the trial court failed to recognize that under the contract, WCD had only two options—terminate the contract or proceed to closing; and that WCD and the trial court could not redefine "substantial completion" to allow WCD to defer closing until it considered the Unit to be Substantially Complete.

WCD primarily supports the trial court's findings and analysis regarding substantial completion, including its determination that NTV's architect, Mr. Thoren, acted unreasonably when he declared that WCD's Unit was Substantially Complete on January 31, 2007. WCD argues that the testimony of Mr. Luce, Mr. Joch and Ms. Powell supports the findings and conclusions of the trial court. Moreover, WCD contends that both Kfoury and nonKfoury work constituted part of the Build–Out Work, and that NTV's " 'Kfoury Work' theory was invented well after litigation began" and "was not supported by the [c]ontract or the evidence." WCD further asserts that even if NTV is correct that it "could demand closing once the 'Kfoury Work' was [s]ubstantially [c]omplete," the Kfoury work was not complete as of January 31, 2007; that the trial judge

correctly found that the parties agreed to extend the Closing Date to February 28, 2007; and that under the contract, WCD properly refused to close prematurely. We are persuaded by our review of the entire record, including trial transcripts and exhibits, and the trial court's analysis, that WCD has the better of the arguments regarding "substantial completion."

We are guided by the following legal principles pertaining to contract interpretation. "Since the proper interpretation of a contract is a legal question, 'this court exercises *de novo* review.'" *Unfoldment, Inc. v. District of Columbia Contract Appeals Bd.*, 909 A.2d 204, 209 (D.C. 2006) (quoting *Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 867 (D.C.2005)). " 'The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms,' and ascertaining the meaning 'in light of all the circumstances surrounding the parties at the time the contract was made.'" *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C.2009) (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205–06 n. 7 (D.C.1984)). "In construing a contract, the court must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Unfoldment, Inc., supra*, 909 A.2d at 209 (quoting *Independence Mgmt. Co., supra*, 874 A.2d at 867) (internal quotation marks and other citation omitted). "In this context, a reasonable person is: (1) presumed to know all the circumstances surrounding the contract's making; and (2) bound by usages of the terms which either party knows or has reason to know." *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 299 (D.C.2006). We apply the "reasonable person standard ... both to the circumstances surrounding the contract and the course of conduct of the

parties under the contract." *Id.* (quoting *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982)) (internal quotation mark and other citation omitted).

### Substantial Completion

██ We conclude that the trial court did not err in determining that substantial completion of the Unit required that all of the Build–Out Work be complete, regardless of who was responsible for the work. Although NTV is correct that the scope of work included under the definition of Build–Out Work never changed, it construes Build–Out Work in a much narrower manner than what the contract permitted from its inception. A review of the relevant provisions of the contract demonstrates that broadly interpreting Build–Out Work to encompass the work that Dr. Deutsch undertook is warranted, as the contract repeatedly references the "Unit." Under the contract, Build–Out Work was defined as "the finishing of the *Unit* beyond Shell Completion according to the Build–Out Plans," regardless of whether the work was conducted by the Base Building Contractor or the Designated Contractor. (emphasis added). The Build–Out Plans were defined as "[t]he Architectural Drawings and Specifications and the Engineering Plans and Specifications, as approved by the seller." Under the contract, Substantially Complete meant "completed, in the reasonable written opinion of the applicable architect ... except for 'punch-list' and other items that do not materially interfere with the use of the *Unit,* in accordance with the Plans and Specifications for Shell Completion and, to the extent the Seller Build Option applies under Section 7.8 ... in accordance with the Build–Out Plans." (Emphasis added.)

██ The testimony presented at trial supports the trial court's findings and conclusions as they relate to substantial completion. WCD offered Mr. Luce as an expert witness in commercial construction and substantial completion of construction projects. Mr. Luce's testimony was consistent with the contractual definition of substantial completion. He testified that the generally accepted construction industry definition of substantial completion is "the point in time or the date upon which work is sufficiently complete so that the premises or the building can be occupied and utilized for its intended purpose"; that upon substantial completion of a construction site, only "minor punch list work" should remain undone; and that the generally accepted definition of a punch list in the construction industry was "work that doesn't interfere with the use and occupancy of the building or the premises." He listed some examples of punch list items— "a ding on the wall where somebody may have hit it, a missing screw here and there, some caulking that maybe wasn't finished or was done in a messy way, nail holes that aren't finished, [or] paint holidays."

Mr. Luce reviewed both the contract between NTV and WCD, along with the contract between NTV and Kfoury, and stated that the definition of "substantial completion" in each contract was materially the same as the generally accepted definition. He reviewed each contract as a part of his job to inspect the Unit. Mr. Luce was asked to take the Build–Out Plans and compare the plans "to the conditions that [he] observed in the space and ... render an opinion as to whether or not the premises were substantially complete." He used a digital camera and digital recorder, as well as the Build–Out Plans, to record his comments when he inspected the Unit on February 10, 2007. He took over one hundred photos of the Unit to determine whether the Unit was Substantially Complete.

Mr. Luce inspected the Unit for three and-a-half to four hours; he recorded "unfinished work that [he] felt should be complete using a standard definition for substantial completion." In the main area of the space he observed "some cabinets that were installed but by and large ... didn't see any finished cabinets." Moreover, "the fixtures were ... either not connected or those that were connected had no water ...," which the superintendent of the building later explained was due to the lack of water "to the suite itself"; "a non[ ] functional hot water heater" that did not have the proper piping completed; and out of sixteen treatment bays, "a handful of sinks [were] installed and the rest were not." The space was not completely painted and "ran the gamut from unfinished drywall to finished walls." "[M]ost of the baseboard strip ... was missing," and the space was not clean, as there was plywood "sticking up all over the place," and "the construction office was a mess." When he entered the bathrooms, he did not see a toilet, but instead saw "a water closet flange on the floor, and the supply coming out of the wall with a shut off valve and the supply tube just sticking up." Additionally, "[a]bove the vanity was a light valance with three open junction boxes and wires hanging out of the junction box." In short, Mr. Luce concluded that the space "had some distance to go before [he] would consider it to be substantially complete."

Mr. Joch did not consider the space Substantially Complete either, because "there was a fair number of things all still missing and not installed yet and ... [he] wasn't aware of any inspections." He noted that the space looked like "a raw space cleaned up ... [without] finishes being completed or floors. There was no dental equipment, there was no cabinetry." Furthermore, "all of the items on the accessory schedules, appliance schedules," and "some ceiling tiles" were missing. In addition, the bathroom in the Unit near the waiting room looked like "just a room .... just a space [with] drywall," without plumbing fixtures, tile work, toilet, or a sink. None of the sixteen operatories (treatment bays) had sinks or faucets installed when Mr. Joch inspected the Unit, although they had "rough end plumbing." In his opinion, "the lack of these things substantially interfere[d] with [WCD's] ability to use the space for its intended purpose." With respect to whether the Kfoury work was Substantially Complete, he "wasn't distinguishing the work" during his inspection, but noted that it was not complete.

Ms. Powell's testimony also was consistent with the contractual definition of Substantially Complete. She distinguished between substantial completion of a portion of the project and the entire project, as "substantial completion is a very loosely used term in construction" indicating that a contractor or subcontractor has completed his part of the work "by a key date on the construction schedule," but "there's a legal description for substantial[ ] complet[ion] [of] the project," which embodied completion of the various "contracts that require people to do specific scopes of work in a specific time frame...." Specifically, substantial completion under the contracting rules of the American Institute of Architects ("AIA") meant "that the space is ready for use by the tenant for the purpose in which it was intended." Generally, the substantial completion date is related to the date upon which final inspections are given. At a minimum, substantial completion is a prerequisite to tenant occupancy, and thus could occur before the tenant occupancy date. However, the substantial completion date can be the same as the tenant occupancy date. Valentine created a construction schedule ("Valentine Schedule") that ended with "tenant occupancy" on February 28, 2007, taking account of the work Dr. Deutsch

undertook. In sum, the testimony of Mr. Luce, Mr. Joch, and Ms. Powell, supports the trial court's conclusion that substantial completion of the Unit required all Build–Out Work to be complete, regardless of who was responsible for that work.

### The Trial Court's Rejection of Mr. Thoren's Certification

■ We see no reason to disturb the trial court's finding that "[t]he record unequivocally establishes that Unit 800 was not Substantially Complete when Mr. Thoren inspected it on January 31, 2007, and that he was unreasonable in stating it was." As the court noted, at the time of his certification "Mr. Thoren was an unlicensed architect who had no professional experience building out dental offices." Moreover, while Mr. Thoren concluded that the Unit was Substantially Complete in his inspection evaluation, the court recognized that his "testimony at trial was considerably more equivocal." In his inspection evaluation, Mr. Thoren stated that the Unit was "substantially complete" because it could "be used for its intended purpose." However, he testified that the Unit was "substantially complete" because it *"was ready for fitting out as offices, particularly when you look at what was the responsibility for the various parties."* Consistent with applicable legal standards, the trial court properly found that Mr. Thoren's "evaluation departed from accepted architectural standards when it declared an active work zone without final inspection certificates to be Substantially Complete."

■ We cannot agree with NTV's argument that the trial court's assessment of Mr. Thoren's testimony was incorrect. "The trial court, when acting as fact-finder as it was in this case, is entitled to credit the testimony of one expert witness over that of another." *In re T.W.M.,* 18 A.3d 815, 821 (D.C.2011) (per curiam). "In resolving factual issues presented by con-

flicting expert testimony, the trial court is in the best position to evaluate the experts' qualifications, demeanor, experience, reasoning, and testimony." *Rock Creek Plaza–Woodner Ltd. P'ship v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983). "If there are appropriate grounds for disregarding an expert's testimony, the trial court may do so.... [And] the trial court is free to make its own independent evaluation of the evidence...." *Id.*

We conclude that the court did not err by crediting the expert testimony of Mr. Joch and Mr. Luce over that of Mr. Thoren in reaching its finding that the Unit was not Substantially Complete when NTV demanded that WCD proceed to closing on the Unit. As a preliminary matter, we note that the court applied the correct standard in evaluating the expert opinions, as the contract required both Mr. Joch and Mr. Thoren to render their opinions "reasonably." Although Mr. Joch had not read the contract's definition of Substantially Complete prior to his inspection, his failure to do so did not nullify the reasonableness of his opinion; the record reveals that his opinion was not unfounded. Before the inspection, he looked to architectural standards provided by the AIA, documents from liability insurance providers, and a manual that listed contract terminology and definitions for substantial completion. He testified that the definition of Substantially Complete in the contract, "completed in the reasonable written opinion of the applicable architect ... except for punch list and other items that do not materially interfere with the use of the unit," was "fairly typical in [his] experience." Indeed, the contractual definition was consistent with his understanding of substantial completion as it is ordinarily used in the construction trade, which was "always ... at [the] end of the project when the space is ready for use. Usually—that usually signifies the end of the construction con-

tract work and everything [ha]s been installed and [is] acceptable minus the punch list." In short, we are satisfied that there is a sound basis in the record for the trial court's decision to reject Mr. Thoren's certification, and instead, to rely on the testimony of Mr. Luce and Mr. Joch in finding that the Unit was not Substantially Complete at the time NTV demanded that WCD proceed to closing.

### The Trial Court's Rejection of NTV's Distinction Between Kfoury and NonKfoury Work

■ The trial court rejected the distinction between Kfoury work ("construction work for which the seller was responsible") and nonKfoury work ("the work WCD had assigned to itself") because "no matter who is responsible for doing which work, a space is either Substantially Complete in accordance with accepted architectural practice or it is not," and NTV was the Unit's "general contractor, and this job was not completed until the project was Substantially Complete on February 28." The court concluded that even if it credited the distinction between Kfoury and nonKfoury work, and further "accept[ed] the assertion that the seller completed its construction by February 1 (ignoring the company's general contracting tasks)," "the argument [relating to the alleged distinction] is contradicted by the record." Our review of the record prompts us to agree with the trial court.

An examination of "the circumstances surrounding the contract and the course of conduct of the parties under the contract" demonstrates that a broad interpretation of Build–Out Work is reasonable. *See*

*Akassy, supra,* 891 A.2d at 299 (quoting *Intercounty Constr. Corp., supra,* 443 A.2d at 32) (internal quotation mark and other citation omitted). Prior to the execution of the contract, Dr. Deutsch testified that the parties agreed that he would be responsible for certain parts of the Build–Out Work. However, no changes were made to the contract, as a result of this agreement, that narrowed the scope of the Build–Out Work or changed the meaning of "Substantially Complete" with respect to triggering the Closing Date. Significantly, the parties did not agree that the Unit would be built out under the Purchaser Build, rather than the Seller Build, Option after Dr. Deutsch assumed responsibility for some of the work. The Build–Out Plans pertained to the entire Unit and did not distinguish between Kfoury work and nonKfoury work; nor was Mr. Joch ever asked to draw up another set of plans containing such a distinction.[7] NTV approved the Build–Out Plans, and it arguably could have negotiated to exclude nonKfoury work from the Plans if it wanted to be consistent with its narrow definition of Build–Out Work.

While NTV contends that the November Addendum comports with its narrow interpretation of Build–Out Work and that WCD effectively removed items from the definition of Build–Out Work under the contract, the record does not support its argument. The pertinent language on which NTV relies is: "Please indicate your approval and agreement with [NTV] executing a contract with Kfoury ... to construct the Build–Out Work for [the] Unit in the amount of ... ($810,683)...." As a

---

7. Mr. Thoren recalled that "a large amount of equipment on some of the equipment schedules" was crossed out on the Build–Out Plans. He understood the cross-outs to signify "a change in the scope of work" pertaining to Kfoury work and nonKfoury work. However, it is unclear who crossed out the items, when they were crossed out, and why they were crossed out. In any event, Mr. Thoren's testimony must be examined together with his admission that "a lot of the work shown" in the Build–Out Plans had not been completed by January 31, 2007, including the installation of the dental equipment. He further testified that the "contractor[ ] [is] responsible for the final hookups of that dental equipment."

result of the November Addendum, Ms. Totah testified that based upon her understanding, the scope of Build–Out Work consisted solely of the work in the contract remaining after the exclusion of work assigned to Dr. Deutsch. However, given that the document does not refer to Dr. Deutsch's work as nonKfoury work outside the parameters of Build–Out Work, at best this language affirmed the parties' understanding that Kfoury would be responsible for certain items, with Dr. Deutsch responsible for others, but both types of work remained under the scope of Build–Out Work for substantial completion purposes.[8] This construction is consistent with NTV's concession that WCD approved Kfoury's cost proposal for its Build–Out Work via the November Addendum, as required pursuant to the Build–Out Timeline. In addition, if NTV thought that only Kfoury work fell under the Build–Out Work that had to be Substantially Complete to trigger closing as a result of the November Addendum, it arguably would not have asked Mr. Joch to inspect the entire Unit, nor would it likely have initially claimed that the entire Unit was Substantially Complete. Moreover, it would not have agreed to Section 3.3 of the Kfoury contract, which specified that "[t]he Contrac-

tor [Kfoury] shall achieve Substantial Completion of the *entire Work* not later than February 1, 2007" (emphasis added). Indeed, NTV recognized that it needed to obtain substantial completion of nonKfoury work, when Bob Reuter, NTV's construction manager, sent an email to Ms. Levitt, WCD's project manager, noting that "[t]he scheduled delivery of the [dental] equipment of February 5, needs to be improved to no later than January 22, *in order for the contractor to maintain their schedule of substantial completion,* or they will be in delay." (Emphasis added.) And, as WCD points out, NTV's acceptance and demand for construction coordination fees for both Kfoury work and nonKfoury work is inconsistent with its argument that Build–Out Work solely pertained to Kfoury work, as construction coordination fees were due under the contract for Build–Out Costs. Thus, we cannot say that "a reasonable person in the position of the parties would have thought the disputed language [in the letter dated November 2, 2006, the November Addendum] meant" to encompass solely Kfoury work. *See Unfoldment, Inc., supra,* 909 A.2d at 209 (quoting *Independence Mgmt. Co., supra,* 874 A.2d at 867) (internal quotation marks and other citation omitted).[9]

8. NTV contends that because the November Addendum removed WCD's work "from the Build–Out Work and was so marked on schedules attached to the Addendum, with the letters 'NIC,' i.e. 'Not in Contract,' or, alternatively, 'to be provided by [Dr.] Deutsch,'" "WCD's work was no longer in the [c]ontract." Thus, it was "no longer Build–Out Work." However, NTV fails to recognize the parties did not agree to remove WCD's work from the contract such that it would no longer constitute Build–Out Work. Indeed, the record demonstrates that the parties did not even agree to a consistent definition of "NIC," and they certainly did not agree that "NIC" was synonymous with "nonKfoury work" that fell outside the scope of Build–Out Work. WCD's letter agreement with Valentine noted certain items that were "NIC," such as

millwork, ceramic/granite, appliances (to be provided by Dr. Deutsch), window modifications (to be provided by others), and occupancy permit (to be provided by NTV). However, the November Addendum marked certain items as "NIC," which primarily fell under the area of "Other Project Costs." Examples of such costs were repair allowance, overtime expenses, and general building permit.

9. NTV argues that a definition of Build–Out Work that excludes nonKfoury work is appropriate because "[s]everal witnesses, including [Ms.] Powell, testified that WCD's work could not be commenced until the bulk of Kfoury work, i.e. the Build–Out Work, was substantially complete." NTV further asserts that "[Ms.] Powell's own testimony and emails belied her testimony that the scope of the Kfoury work and the WCD work could not be

Further, even if we were to construe the contract as NTV alleges and tie substantial completion only to the Kfoury work as defined in the November Addendum, the record demonstrates that NTV still would have been in breach of contract on February 1, 2007, because the Kfoury work was not Substantially Complete as of that date. Kfoury's responsibilities included ceilings, paint, doors, plumbing (*e.g.*, fixtures such as toilets, dental sinks, lavatory, sterilization sink with emergency eye wash), and all electrical installations (including the complete installation of a hot water heater). Ms. Powell testified that as of January 31, 2007, "the space [was] not ready for all the finishes and all of the equipment installation...." In fact, the testimony of all three experts establishes that the Kfoury work was not complete by February 1. Both Mr. Joch and Mr. Luce observed that the ceilings and restrooms were unfinished, and the majority of the dental sinks were sitting on the floor of the Unit uninstalled. While Mr. Thoren was unsure whether the plumbing fixtures were installed, he observed an uninstalled hot water heater, and unfinished doors and paint jobs. The fact that Mr. Joch had approved a final progress payment and the Unit had received a temporary certificate of occupancy is inapposite because the Kfoury work remained incomplete.[10] Therefore, regardless of whether the scope of the Build–Out Work distinguished between Kfoury work and nonKfoury work, NTV did not Substantially Complete its obligations by February 1, 2007, and thus breached the contract when it demanded that WCD close five days later.[11]

separated." In support of this argument, NTV notes that Ms. Powell distinguished between Kfoury work and nonKfoury work by stating in an email, "Just a note to clarify the Substantial Completion Scope vs. Dr. Installation," followed by a list of items for which Dr. Deutsch was responsible. However, at trial, Ms. Powell distinguished between substantial completion of a portion of the project and the entire project, and she never admitted that Dr. Deutsch's work was outside the work that needed to be Substantially Complete to trigger closing. In any event, although the Kfoury work and nonKfoury work were allocated to different parties and thus could technically be completed separately, the contract still dictated that the entire Unit had to be Substantially Complete to trigger closing, and the parties never agreed to exclude Dr. Deutsch's work from the scope of the Build–Out Work that had to be Substantially Complete to require closing.

10. Ms. Totah admitted that as of January 31, 2007, hardware was missing from the elevators and security still had to be provided for the elevators; temporary doors to secure access to the eighth floor were not installed until February 8, 2007. Because Ms. Totah knew that the Valentine schedule was produced that showed a February 28th deadline "for when ... all the disparate parts of the work would be done," she asked to meet with Dr. Deutsch on December 15, 2006. At that meeting, she informed Dr. Deutsch that substantial completion of the Kfoury work by February 1, 2007 would fulfill NTV's obligations under the Seller Build Option, and if he wanted to "take an additional month to do his work ... he would need to pay for the additional time before closing." Dr. Deutsch refused to pay for the additional time.

11. Because we conclude that NTV was in breach on February 1 regardless of the scope of the Build–Out Work because the work under either scenario was not Substantially Complete, we do not reach the issue of whether Valentine and Kfoury were agents of NTV such that their actions bound NTV to the February 28, 2007 tenant occupancy date listed on the Valentine Schedule. In any event, the record does not demonstrate that the parties agreed that tenant occupancy and substantial completion would embody the same definitions. As Ms. Powell testified, while the substantial completion date could be the same as the tenant occupancy date, at a minimum, substantial completion is a prerequisite to tenant occupancy.

Moreover, NTV argues that WCD rejected its offer to extend the February 1, 2007 Closing Date to February 28, 2007 in exchange for payment to NTV and, as such, breached its contract when it refused to go to closing on

In sum, we cannot agree on this record that the trial court's findings are plainly wrong with respect to substantial completion; or that the court abused its discretion in crediting the testimony of Mr. Joch and Mr. Luce over that of Mr. Thoren. Nor can we agree that the trial court erred in its interpretation of the contractual provisions pertaining to the meaning of Substantially Complete. Consequently, we hold that the Build–Out of Unit 800 was not Substantially Complete by February 1, 2007, and that NTV breached its contract with WCD when it demanded closing on the Unit prior to February 28, 2007, when it was Substantially Complete.

### The Construction Coordination Fee Issue

■■■■ NTV contends that the trial court erred in "rel[ying] on an email exchange between the parties' real estate agents[ ] to justify [WCD's] refusal to pay a construction fee on the work it refused to disclose at closing." NTV also maintains that the trial court did not take into consideration WCD's failure "to disclose to NTV all of its expenditures," which "in total, equaled about $600,000"; and it further argues that "every reasonable inference should have been drawn in NTV's favor." NTV claims that it was entitled to "the full $30,000 sought, irrespective of any defense WCD might have raised to paying a fee on that entire sum."

WCD generally supports the trial court's analysis of the construction coordination fee issue. WCD asserts that virtually all of the $600,000 that served as the basis for NTV's request constituted payments to third-party vendors, and thus covered items that the parties explicitly agreed to exclude from the construction coordination fees by the parties. Furthermore, WCD argues that it disclosed to NTV the only fees for which WCD was responsible—an amount that totaled $31,082, as the trial court found.

Under § 7.10(c) of the contract, WCD agreed to "pay [NTV] a fee at [c]losing of five percent (5%) of all Build–Out Costs, as a construction coordination fee." "Build–Out Costs" are defined in Section 1.1 of the contract; the definition specifies "that for the purpose of calculating the fees described in … Section 7.10(c), Build–Out Costs shall mean the costs described in clause (i) of this definition…." Clause (i) of the definition states: "all direct costs for the Build–Out Work including without limitation general contractors' and subcontractors' fees, general conditions, and all costs for labor and materials, and changes thereto, regardless of who performs the work or supplies the material." The trial court determined in its decision and order of judgment that: "In March and April 2006, WCD, through its real estate agent, Geoffrey Kieffer, negotiated with [NTV],

February 6, 2007 because time was of the essence under the contract. Aside from the fact that WCD had grounds to reject NTV's offer because the Unit was not Substantially Complete on February 1, 2007, we note that at trial, NTV failed to pursue its options under the contract to recoup damages resulting from any delays. Under Section 7.10(d) of the contract, the parties agreed that "[a]ny delay … in meeting the dates on the Build–Out Timeline" would "result in a corresponding extension of the Delivery Deadline," with WCD responsible for NTV's costs associated with the delay. Section 1.1 of the contract

defined the Delivery Deadline as "the date three (3) months after the Target Date," and the Target Date was the "intended date for Substantial Completion of the Unit to the level of Shell Completion, not later than October 1, 2006." Additionally, Section 7.5(c), titled "Force Majeure," described delays for which NTV was not responsible, including "failure of Purchaser (if it elects the Seller Build Option) to timely deliver the proposed Build–Out Plans or required revisions [and] failure of Purchaser to perform any other function necessary in completing the Build–Out Work…."

through its real estate agent, Eugene Kenney, and the parties agreed to exclude from the 5% fee the work of contractors hired by WCD for the purchase and installation of dental equipment, telephones, furniture, computers and stereo equipment." The record supports this finding.

On August 25, 2009, NTV requested that the trial court award it $30,000 in construction coordination fees. The trial court awarded NTV 5% on $31,082, which amounted to $1,554, plus prejudgment interest. The court noted that although "WCD's record keeping is deficient concerning what work fell into the category of non-Kfoury work on which a management fee was owed," NTV bore the burden of recovery of unpaid commission, and the "most reliable evidence in the record" supported the $1,554 amount.

▆▆▆▆▆ Contrary to NTV's position, we conclude that the trial court did not err in examining extrinsic evidence to determine whether Build–Out Costs included the nonKfoury work in dispute such that WCD was obligated to pay NTV its construction coordination fees. Extrinsic evidence "may not be relied upon to show the subjective intent of the parties absent ambiguity in the contract's language." *Debnam, supra,* 976 A.2d at 197; *see also Akassy, supra,* 891 A.2d at 299. "However, extrinsic evidence may be considered to determine the circumstances surrounding the making of the contract, so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." *1010 Potomac Assocs., supra,* 485 A.2d at 205–06 (citations and footnote omitted). Here, extrinsic evidence was relevant to determining what meaning a reasonable person in the position of NTV and WCD would have given to the definition of Build–Out Costs as it related to the construction coordination fee. Sections 1.1 and 7.10(c) of the contract defined Build–Out Costs as "di-

rect costs for the Build–Out Work including without limitation general contractors' and subcontractors' fees," and these fees were due "regardless of who perform[ed] the work or supplie[d] the materials."

It is true that the contract contains an integration clause stating that "[t]his Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede any letter of intent and any other agreements and understandings (written or oral) between Seller and Purchaser on or prior to the date of this Agreement...." Given that the parties had engaged in lengthy negotiations to reach consensus on the material terms, it is likely that they intended the contract to be a completely integrated document. *Cf. Hercules & Co. v. Shama Rest. Corp.,* 613 A.2d 916, 927–29 (D.C.1992); *Stamenich v. Markovic,* 462 A.2d 452, 455–56 (D.C.1983). However, regardless of whether the document was completely or partially integrated, WCD was required to pay NTV a "construction coordination fee" of 5% of all of the Build–Out Costs at closing, but prior to executing the contract, the parties agreed via email that the contractors that Dr. Deutsch would hire directly to install items such as telephones, stereo systems, furniture, dental equipment, and supplies, would be excluded from the definition of Build–Out Costs and thus exempt from the 5% construction coordination fee. They agreed to change the language in "Build–Out Costs" from just "contractor fees" to "general contractor and subcontractor fees." On April 7, 2006, Eugene Kenney, NTV's representative stated that he "did not see the fees being applicable" to WCD's examples of telephones, stereo systems, furniture and dental equipment and supplies. Although Ms. Totah testified that she did not agree to changing the language, the contract reflects this amended language, and thus a reasonable person in the position of NTV

and WCD would have thought that the nonKfoury work noted above would not be subject to the 5% construction coordination fee.

▮▮ Moreover, the court did not err in determining that most of the $600,000 that served as the basis for NTV's request covered nonKfoury work that the parties agreed to exclude from the scope of the construction coordination fees. Dr. Deutsch admitted that he understood that NTV expected to be paid the 5% construction coordination fee for some of the "work done outside of the [Kfoury] contract," which included things he did himself. However, he also testified that the bulk of NTV's requested amount was comprised of installation of dental equipment (approximately $280,000) and dental cabinetry (approximately $300,000), which the parties agreed would be exempt from the construction coordination fees. Dr. Deutsch conceded that he should have paid construction coordination fees on nonKfoury work performed by Apex Tile & Marble, and other work performed by Ms. Levitt, as the parties had not agreed to exclude those items. The total sum of this work was $31,082. Although Ms. Totah testified that she was unable to ascertain the actual amount of Dr. Deutsch's work because he did not provide her with "anything that was clear .... [to] allow [her] to clearly delineate what he paid," she admitted that she did not subpoena any of his contractors, nor did she ask about the computer work invoices during Dr. Deutsch's deposition, to get a better sense of the actual amount. She also could not say whether the $600,000 included the $103,000 upon which Dr. Deutsch had already paid construction coordination fees. Because NTV has not offered any other proof of WCD's costs, like the trial court, we are con-

strained to rely on the most accurate assessment of the fees that is reflected in the record evidence. In short, we see no reason to disturb the court's award of construction coordination fees in the amount of $1,554 (5% of $31,082) to NTV.[12]

### The Attorneys' Fees Issue—WCD's Cross Appeal

▮▮ In its cross-appeal, WCD challenges the trial court's judgment regarding attorneys' fees and the handling of the amount it had placed in escrow. In sum, the trial court declared that WCD's "requests for [attorneys'] fees prior to July 2007 and for prejudgment interest are effectively mooted by the $100,000 cap" set forth in the contract. The court determined that "[t]he escrow returned to [WCD] was $56,907, and attorneys['] fees and costs amounted to $178,294.14[,]" and "[t]hese two sums far exceed the $100,000 cap...." Consequently, the trial court awarded WCD $43,093 in attorneys' fees (counting $100,000 minus $56,907 to arrive at $43,093).

Section 14.2 of the contract limits NTV's liability to $100,000 against all Losses in excess of $50,000. Section 15.12, however, provides for all reasonable attorneys' fees to be awarded to the prevailing party. Although Section 1.1 of the contract includes attorneys' fees in the definition of "Losses," WCD argues that Section 15.12 exempts attorneys' fees from the $100,000 liability cap, as attorneys' fees are considered cost and not damage awards. In addition, WCD contends that the $56,907 it placed in escrow should not have been included in the calculation of the amount awarded to it as attorneys' fees. NTV contends that the liability cap in Section 14.2 "indisputably applies to WCD's fee request," and that the trial court correctly

---

12. In addition, we note that the record does not support NTV's argument that WCD breached the covenant of good faith and fair dealing because it deliberately sought to hide the cost of the nonKfoury work to avoid paying NTV's fee.

included the escrow amount in deciding the attorneys' fees to which WCD was entitled under the contract.

 "This court generally defers to the broad discretion of the trial judge in the calculation and award of attorney's fees." *Pellerin v. 1915 16th St., N.W., Coop. Ass'n*, 900 A.2d 683, 690 (D.C.2006) (quoting *District of Columbia v. Hunt*, 520 A.2d 300, 304 (D.C.1987)) (internal quotation marks omitted). Moreover, we adhere to "the American Rule under which . . . every party to a case shoulders its own attorneys' fees, and recovers from other litigants only in the presence of statutory authority, a contractual arrangement, or certain narrowly-defined common law exceptions. . . ." *Psaromatis v. English Holdings I, L.L.C.*, 944 A.2d 472, 490 (D.C. 2008) (quoting *Oliver T. Carr Co. v. United Techs. Commc'ns Co.*, 604 A.2d 881, 883 (D.C.1992)) (internal quotation marks and other citations omitted). Whether we apply the contractual arrangement exception "will depend upon whether the parties agree to fee-shifting as reflected by the language in the parties' contract." *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 473 (D.C.2008). Accordingly, we must examine "any relevant contractual language [that] is required to determine the scope of any claimed fee-shifting provision." *Id.* at 474.

Here, based on our review of the contractual language, we conclude that the liability cap applies to the recovery of WCD's attorneys' fees. As a threshold matter, it is undisputed that "the American rule does not control" because the parties agree that there was "a contractual arrangement" governing fee-shifting, the prevailing party provision in § 15.12. *See Psaromatis, supra*, 944 A.2d at 490; *see also BSA 77 P St. LLC v. Hawkins*, 983 A.2d 988, 997 (D.C.2009). However, we do not stop there, because our task is reconciling § 15.12 with the liability cap in Section 14.2 to determine the scope of the fee-shifting provision. *See Raleigh, supra*, 947 A.2d at 474. In order to do so, we must also examine other relevant provisions to "giv[e] a reasonable, lawful, and effective meaning to all [of the contract's] terms. . . ." *Debnam, supra*, 976 A.2d at 197 (quoting *1010 Potomac Assocs., supra*, 485 A.2d at 205) (internal quotation mark omitted).

Section 15.12 of the contract states that "[i]f any litigation or other court action . . . is sought, taken, instituted or brought by Seller or Purchaser to enforce its rights under this Agreement, all fees, costs and expenses, including without limitation, reasonable attorneys['] fees and court costs, of the prevailing Party in such action, suit or proceeding shall be borne by the Party against whose interest the judgment or decision is rendered." However, Section 14.2(a) subjects the Seller's liability to the limitations in the contract, including § 14.2(b), which states that "[n]otwithstanding anything to the contrary in this Agreement, except for delay liquidated damages provided in Section 7.5," the Seller will not incur liability to the Purchaser for the first $50,000 in the "aggregate amount of Losses incurred by the Purchaser for which Purchaser would otherwise be entitled to recover[ ]," and the "Seller's aggregate liability to Purchaser under or related to this Agreement . . . shall not exceed" $100,000. Section 14.3 further states that "[e]xcept for claims based on actual fraud, the recovery permitted under Section 14.2 shall be the sole and exclusive remedy of Purchaser with respect to any claim for Losses and Liabilities arising from or in connection with this Agreement."

 Because Sections 15.12, 14.2, and 14.3 refer to Losses and Liabilities, cross-referencing the contract's definitions of those terms is required. Under Section 1.1, "Liabilities" is defined as "with respect

to the Person in question, any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever ... which is incurred by such Person," and "Losses" is defined as "with respect to the Person in question, any actual liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys['] fees and expenses and court costs, incurred by such Person." While it is true that "where a contract provides that fees are to be awarded to the prevailing party, the fees will be collateral to the merits of the case and will not be an element of damages to be proved at trial," *Calomiris v. Calomiris,* 3 A.3d 1186, 1193 (D.C.2010), the distinction is not material to determining whether Section 15.12 controls in the instant case because Section 1.1 lumps both damages and reasonable attorneys' fees under "Losses." Given that Section 14.2(a) limits the Seller's liability for the "aggregate amount of Losses," and § 14.3 further provides that Section 14.2 "shall be the sole and exclusive remedy of Purchaser with respect to any claim for Losses and Liabilities," we are constrained to conclude that the liability cap in Section 14.2(b) applies to WCD's recovery of attorneys' fees. Although WCD complains that this result places it "at an unfair disadvantage," we note that it could have "avoid[ed] the result adverse to it by a 'more providently worded' provision governing the recovery of attorneys' fees," *Carr, supra,* 604 A.2d at 884 (quoting *Ochs v. L'Enfant Trust,* 504 A.2d 1110, 1119 n. 9 (D.C.1986)), particularly in light of the fact that Section 14.2(b) carves out an exception for "delay liquidated damages," and Section 14.3 creates an exception for "claims based on actual fraud."

 Nevertheless, we conclude that the trial court erred in applying the escrow funds towards the liability cap and awarding prejudgment interest on the escrow funds. "[T]he nature of an escrow agreement, like any other contractual arrangement, must be determined by the intent of the parties as evidenced by all the facts and circumstances surrounding the creation of the escrow." *Stuart v. Clarke,* 619 A.2d 1199, 1200 (D.C.1993) (per curiam). Here, WCD agreed to put $56,907 in escrow as NTV's potential damages award if WCD was found liable for the delay in proceeding to closing; however, title for the funds would not be passed to NTV unless it won the dispute. "Thus, the condition the parties agreed to for release of the escrowed funds ... was a condition '[precedent]' to passage of title to the matter in escrow.'" *Id.* at 1201 (citation omitted). That condition never occurred, and hence, title never passed, and WCD was entitled to the return of the escrow amount. As there is no evidence that the parties intended for the escrow funds to be considered part of NTV's liability should WCD win the dispute, the trial court erred in counting these funds towards the cap under WCD's award of attorneys' fees. Since the parties *agreed* to put the funds in escrow "pending resolution of all claims between" them, we cannot say that prejudgment interest was properly awarded, as it is "'an element of complete compensation' to a creditor for the loss of use of money that a debtor wrongfully withholds." *District Cablevision Ltd. P'ship v. Bassin,* 828 A.2d 714, 732 (D.C.2003) (quoting *Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1253 (D.C. 1990)).[13]

---

**13.** NTV argues that WCD was limited to the two remedies provided under Section 12.1 of the contract in the event of NTV's default. Section 12.1 defines Seller Default as "(i) at any time prior to [c]losing, Seller is in materi-

al breach or default of any of its representations, warranties, covenants or obligations" not caused by Purchaser, "or (ii) at [c]losing Seller has not satisfied any one or more Purchaser Closing Conditions." Under Section

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court with respect to breach of contract and construction coordination fees, but we remand its judgment regarding the award of attorneys' fees, with instructions to award WCD the total sum of $100,000 in attorneys' fees,—that is, the additional sum of $56,907 which it subtracted from the contract's $100,000 liability cap, without prejudgment interest.

*So ordered.*

12.1, Purchaser remedies for Seller Default are limited to either terminating the agreement and being refunded the Earnest Money to Purchase, or proceeding to closing "without any reduction in the purchase price." Thus, NTV contends that WCD "had no right to refuse to close while, at the same time, keeping the Contract alive." However, as the court noted, "[t]his argument cannot survive the fact that the parties agreed to a third course: Completion of the space, occupancy, and settlement on March 1, 2007." Thus, we do not reach NTV's argument that because WCD called the NTV breach "nonmaterial" in its Opposition to Defendant's Motion for Partial Summary Judgment, its duty to close was not discharged.